671 A.2d 1140

### REFUSE MANAGEMENT SYSTEMS, INC. Appellant

v.

### CONSOLIDATED RECYCLING AND TRANSFER SYSTEMS INC., LCA Leasing, Inc. and North Penn Recycling, Inc.

### REFUSE MANAGEMENT SYSTEMS, INC.

v.

### CONSOLIDATED RECYCLING AND TRANSFER SYSTEMS INC., LCA Leasing, Inc. and North Penn Recycling, Inc.

### Appeal of LCA LEASING, INC.

Superior Court of Pennsylvania.

Argued Dec. 5, 1995.

Filed Feb. 12, 1996.

404

Nicholas D. Krawec, Pittsburgh, for Refuse Management System, Inc.

Jeff Brooks, Pittsburgh, for LCA Leasing, Inc.

Before CIRILLO, TAMILIA and BROSKY, JJ.

CIRILLO, Judge:

This is an appeal and cross-appeal from an order granting in part the post-trial motions of defendant LCA Leasing, Inc. and assessing damages in favor of plaintiff Refuse Management Systems, Inc. We affirm in part, vacate in part, and remand.

Refuse Management Systems, Inc. (RMS) is a waste and recycling brokerage company, which arranges and coordinates transportation for hauling waste to disposal sites. LCA Leasing, Inc. (LCA) is the on-site leasing agent for a fifty-two acre property located in Chester, Pennsylvania which encompasses a waste transfer station[1] and several other properties and rentals. LCA procures tenants, receives the rent for the property and transfers the payments to the corporate offices in Pittsburgh, Pennsylvania.

---

1. A waste transfer station is essentially a location where small haulers, that cannot afford to transport great distances, bring their waste. The waste is then consolidated and loaded onto larger trucks for transport to a landfill.

The owner of the 52–acre property is Chester Solid Waste Management Associates. When it purchased the property in 1984, LCA was the leasing agent on site, and part of the agreement required retention of LCA's name. The license for the waste transfer facility was issued to LCA.

LCA leased the transfer station to Consolidated Recycling and Transfer Systems, Inc. (Consolidated) in 1988, whereby Consolidated would run the day-to-day operations and, in return, LCA would receive a royalty payment from Consolidated's operation of the facility. Consolidated contracted with RMS to ship wastestream from the Chester facility to landfills in West Virginia, Ohio, Pennsylvania and Indiana. On April 17, 1990, RMS sent a facsimile (FAX) verifying that two trucks would pick up waste from the facility the next day, and outlining the billing and payment procedures. In a return FAX, Kirk Johnson, then working for Consolidated, confirmed the contract, which set the price at $43.00 per ton with a twenty-two ton minimum, directed that invoices be sent to the Princeton, New Jersey office, and changed the payment terms from three to within ten days of invoicing.

Less than three months later, Consolidated had outstanding bills with several of the haulers, including $4,802.67 owed to RMS. On July 3, 1990, after Consolidated had also defaulted on its lease and violated its agreement with LCA, LCA took possession of the transfer station. LCA met with Consolidated's employees at the transfer station, announced that it was taking over operation of the transfer station, and offered them the opportunity to work for LCA. Kirk Johnson, who was RMS's main contact, remained in his position as scalemaster at the facility and became an employee of LCA.

Later that day, LCA discovered that the trucking companies which hauled the trash from the transfer station were reluctant to service the facility because of Consolidated's unpaid invoices. The transfer station was required, under Pennsylvania law, to remove any waste it received within a twenty-four hour period. LCA had to remove the accumulated waste quickly, or it would be sent notification of a violation. In an effort to avoid such violation, LCA agreed to pay one of Consolidated's outstanding invoices as an inducement to each company which would commit to sending trucks to the Chester facility that day. RMS was one of these companies, and subsequently continued to provide service for LCA under the same terms and conditions as it had for Consolidated.

On August 28, 1990, LCA sent RMS a letter directing that all future invoices be sent to Kirk Johnson at the Chester address, instead of the Pittsburgh office. LCA would only prepare checks for tonnage hauled during the previous week from approved invoices forwarded by Kirk Johnson. Three weeks later, Mr. Johnson and RMS's president discussed a rate adjustment to $44.00 per ton, with a twenty-one and one-half ton minimum per load, which Mr. Johnson confirmed by FAX dated September 19, 1990.

Throughout the summer, LCA continued to seek another lessee to operate the transfer station and entered into an agreement with North Penn Recycling, Inc. (North Penn), effective October 15, 1990. Kirk Johnson was retained as a scalemaster for North Penn at the transfer station. On October 31, 1990, Mr. Johnson informed RMS that there was a "name change," but that everything else, including invoicing directly to the Chester station, was to remain the same. As a result, RMS regarded North Penn as LCA operating under a different name, and did not make the routine credit check for a new account. RMS merely changed its internal records to reflect the name change.

By November 13, 1990, North Penn was already in default on its account, and when RMS called the station to inquire about it, Mr. Johnson informed RMS that North Penn was a separate entity from LCA and the sole obliger on all shipments after October 13, 1990, pursuant to its agreement with LCA. RMS, however, continued to provide services to North Penn until November 19, 1990. After an unsuccessful attempt to collect the debt, RMS commenced this action against Consolidated, North Penn[2] and LCA[3] for the unpaid invoice balances.

2. Judgment by default was entered against Consolidated and North Penn when they failed to respond to the complaint filed in 1991. Both defaulting companies are apparently financially insolvent.

3. RMS also claimed damages for fraud on behalf of LCA, which was not addressed by the trial court's order and opinion. RMS states that the claim of fraud is not an issue on appeal, thereby abandoning the claim.

The Honorable Eunice Ross presided over the one-day bench trial. At the close of testimony, the court invited the parties to submit briefs supporting their respective positions in lieu of oral argument. Subsequently, the court found that a contract existed between RMS and LCA, that LCA had failed to notify RMS that a new company, North Penn, was operating the facility, and, on September 12, 1994, entered an order against LCA for $34,042.62, plus interest at 6% per annum from the date of the last invoice. LCA filed exceptions to the order of the court requesting (1) judgment notwithstanding the verdict (j.n.o.v.), (2) a new trial, or (3) a remittitur of the damage award.

Judge Ross dismissed the exceptions, denied a new trial, reduced the damage award against LCA by $18,580.32, and entered a new order on December 15, 1994 against LCA for $15,462.32, which did not include interest as awarded initially. RMS immediately filed a motion to mold the verdict claiming that the court miscalculated the invoices in its modification and misapplied $6,000.00, which was paid by North Penn, to the amount owed by LCA. RMS then filed this timely appeal on January 13, 1995;[4] subsequently, LCA filed its appeal.

LCA raises five issues in its cross-appeal:

4. RMS's appeal is properly before this court. The trial court opinion of February 7, 1995 notes that RMS had petitioned the court for reconsideration of the modification of the court's original order. Pursuant to Rule 1701(b)(3), the trial court could grant reconsideration of its order, even after an appeal is taken, if: (i) an application for reconsideration is timely filed with the trial court, and (ii) the trial court files an order expressly granting reconsideration within the time prescribed for the filing of a notice of appeal. Pa.R.A.P. 1701(b)(3), 42 Pa.C.S.A. RMS filed its notice of appeal twenty-eight days after the entry of the order, when the trial court did not act upon its petition, in order to preserve the appeal.

Subdivision (b)(3) is intended to handle the troublesome question of the effect of application for reconsideration on the appeal process.... The better procedure under this rule will be for a party seeking reconsideration to file an application for reconsideration below and a notice of appeal, etc..... If the trial court ... fails to enter an order "expressly granting reconsideration" within the time prescribed by these rules for seeking review, Subdivision (a) becomes applicable and the power of the trial court ... to act on the application for reconsideration is lost.

1. Did the trial court err in permitting RMS to try this action on a contract theory where RMS did not allege a contract cause of action against LCA?

2. Did the trial court err in concluding that a long-term contract existed between RMS and LCA where RMS presented no evidence of any undertaking of greater than one day's duration?

3. Did the trial court err in concluding that LCA was liable for invoices submitted by RMS after October 19, 1990 where the only evidence of LCA's obligation in that regard were the alleged hearsay statements of an employee of North Penn Recycling, Inc.?

4. Did RMS waive its point of error regarding the trial court's alleged miscalculation of the remittitur where it did not present any basis for the alleged error in any post-trial motion?

5. Is RMS permitted double recovery for amounts paid by North Penn Recycling toward the outstanding balance for which RMS seeks recovery against LCA and where RMS did not plead or present evidence to support the $6,000 as an item of its damages?

In reviewing a non-jury verdict, the appellate court must determine "whether the findings of the trial court are supported by the evidence or whether the trial court committed error in any application of the law." *Coscia v. Hendrie*, 427 Pa.Super. 585, 589, 629 A.2d 1024, 1026 (1993). An appellate court has the authority to determine whether the findings of the trial court support its legal conclusions, and may interfere with those conclusions if they are unreasonable in light of the trial court's factual findings. *C.R. by Dunn v. The Travelers*, 426 Pa.Super. 92, 626 A.2d 588, 591 (1993). Additionally, as this court recently stated:

Pa.R.A.P. 1701, Note. Since the trial court did not enter the required order within the thirty-day period during which RMS could file its appeal, the trial court lacked jurisdiction to take any further action on the plaintiff's motion. Pa.R.A.P. 1701(a), 42 Pa.C.S.A.; *see also Hoag v. Hoag*, 435 Pa.Super. 428, 646 A.2d 578 (1994).

It is well settled that judgment notwithstanding the verdict may be granted "only in a clear case, where after viewing the evidence in the light most favorable to the verdict winner, no two reasonable minds would disagree that the verdict was improper." Similarly, a new trial may only be awarded when the verdict is so contrary to the evidence as to shock one's sense of justice.

*McDole v. Bell Telephone Co. of PA,* 441 Pa.Super. 88, 93, 656 A.2d 933, 935 (1995) (citations omitted).

 LCA first claims that the court erroneously permitted RMS to try this action on a contract theory because RMS made no reference or allegation in its complaint that a contract was entered into between RMS and LCA. LCA avers that it was undeniably prejudiced, since it prepared its defense for trial based on the claims LCA interpreted were being alleged by RMS, namely, agency and fraud. This claim is meritless.

After carefully examining the pleadings, we find that the facts in RMS's complaint were sufficient for LCA to ascertain a possible contract theory. Specifically, we note the following defense raised by LCA in its response:

Plaintiff's claim is barred in whole or in part [by] the doctrine of *novation.*

Defendant's New Matter p. 7 (emphasis added).

 A novation is a *"substituted contract* that includes as a party one who was neither the obligor nor the obligee of the original duty." RESTATEMENT (SECOND) OF CON-TRACTS § 280 (1979) (emphasis added). The requisites of a novation are: (1) the displacement and extinction of *an existing valid contract* ; (2) the substitution for it of a valid new contract, whereby a new party replaces one of the original parties; (3) sufficient legal consideration for the new contract; and (4) the *agreement or consent of all the parties to the new contract. Yoder v. T.F. Scholes, Inc.,* 404 Pa. 242, 173 A.2d 120 (1961) (emphasis added). Furthermore, it is well established that "[h]e who asserts a novation must properly plead

and prove it." *Id.,* at 245, 173 A.2d at 122 (citing *Taylor v. Stanley Co. of America,* 305 Pa. 546, 158 A. 157 (1932)).

Initially, the fact that a novation must be "properly" pleaded suggests that it is an affirmative defense. Affirmative defenses are governed by Pa.R.C.P. 1030, 42 Pa.C.S.A., which provides:

All affirmative defenses including but not limited to the defenses of accord and satisfaction, arbitration and award, assumption of the risk, consent, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fair comment, fraud, illegality, immunity from suit, impossibility of performance, justification, laches, license, payment, privilege, release, res judicata, statute of frauds, statute of limitations, truth and waiver shall be pleaded in a responsive pleading under the heading "New Matter." A party may set forth as new matter any other material facts which are not merely denials of the averments of the preceding pleading.

Novation is not specifically enumerated as an affirmative defense in Pa.R.C.P. 1030, however, the list is clearly not exclusive. An affirmative defense is "matter asserted by a defendant which, assuming the complaint to be true, constitutes a defense to it. [It is a] response to a plaintiff's claim which attacks the plaintiff's legal right to bring an action, as opposed to attacking the truth of the claim." Black's Law Dictionary 60 (6th ed. 1990). This court recently explained that an affirmative defense "will require the averment of facts extrinsic to the plaintiff's claim for relief." *Falcione v. Cornell School District,* 383 Pa.Super. 623, 628–629, 557 A.2d 425, 428 (1989).

A review of Pa.R.C.P. 1030 reveals that several listed defenses specifically shield a defendant from liability on a contract: accord and satisfaction, estoppel, failure of consideration, and impossibility of performance. Additionally, in *Falcione, supra,* we held that a defendant seeking to avoid liability on its contract due to rescission, "had an obligation to raise this issue in its new matter since it is a fact which is

clearly extrinsic to the plaintiff's claim for relief." *Id.* at 629, 557 A.2d at 428. Similarly, a substituted contract, in this case a novation, effects an immediate change in the legal relations between the parties; it discharges the original duty, whereby the remaining party would be foreclosed from enforcing the original duty upon breach of the substituted contract. RE-STATEMENT (SECOND) OF CONTRACTS § 279 (1979). Applying these principles, we hold that both a "substituted contract" and a "novation" are affirmative defenses which must be raised under the heading new matter in a defendant's responsive pleading, or the defenses will be deemed waived. *See* Pa.R.C.P. 1032(a), 42 Pa.C.S.A.

Instantly, LCA did raise the affirmative defense of novation in its new matter. In doing so, LCA is presumed to allege that all the requisites of a novation, including a valid contract, *Yoder, supra,* are present in its case. Clearly, any material facts set forth as new matter, including affirmative defenses, raise issues that are not encompassed in the previous plead-ing. Having exercised its option to aver the existence of a valid contract, a fact "extrinsic to the plaintiff's claim for relief," *Falcione, supra,* LCA cannot now complain that RMS's complaint was the cause of its failure to prepare its defense on a contract cause of action. Accordingly, this court need not examine RMS's complaint to determine the sufficien-cy of the facts set forth therein against LCA.[5]

■ In its second issue, LCA argues that the record is devoid of any evidence that the parties entered into an agree-ment, oral or written, on July 3, 1990, and therefore the court's conclusion that a long term contract existed is an error of law. LCA alleges that the evidence of record shows only "a day-to-day, cash and carry operation." We disagree.

■ LCA correctly points out that "the question of whether an undisputed set of facts establishes a contract is a matter of law." *Buff v. Fetterolf,* 207 Pa.Super. 92, 97, 215 A.2d 327, 330

---

**5.** In light of this discussion, LCA's assignment of further error in the trial court's "sua sponte" determination of its liability for "failure of an attempted novation of a contract between LCA and RMS," (Appellee's brief, n. 1), is equally without foundation.

(1966). It is also well settled that in order for an enforceable agreement to exist, there must be a "meeting of the minds," whereby both parties mutually assent to the same thing, as evidenced by an offer and its acceptance. *Hahnemann Medical College & Hospital of Phila. v. Hubbard,* 267 Pa.Super. 436, 406 A.2d 1120 (1979). It is equally well established that "an offer may be accepted by conduct and what the parties do pursuant to the offer is germane to show whether the offer is accepted." *Accu–Weather, Inc. v. Thomas Broadcasting Co.,* 425 Pa.Super. 335, 340, 625 A.2d 75, 78 (1993). "In cases involving contracts wholly or partially composed of oral communications, the precise content of which are not of record, courts must look to the surrounding circumstances and course of dealing between the parties in order to ascertain their intent." *Boyle v. Steiman,* 429 Pa.Super. 1, 17, 631 A.2d 1025, 1033 (1993); *see also Westinghouse Electric Co. v. Murphy, Inc.,* 425 Pa. 166, 171, 228 A.2d 656, 659 (1967). We must, therefore, look to the parties' "course of conduct" to ascertain the presence of a contract.

Instantly, the following is evident from the record: 1) LCA informed RMS that it was taking over the transfer station on July 3, 1990; 2) LCA agreed to pay RMS for one week of Consolidated's delinquent account in order to induce RMS to service the station on that day; 3) RMS provided and LCA accepted removal services on July 3, 1990, and continued to utilize RMS's services for approximately three months (July, August & September); 4) LCA paid RMS for the previous week's services at the rate set between RMS and LCA's predecessor until September 19, 1990, when the parties agreed to a rate adjustment; and 5) LCA amended the billing/payment procedures in August, 1990.

This course of conduct continued until October 13, 1990. Thus, it is clear that LCA intended to utilize RMS's services to haul waste from the station on a continuing basis at an agreed price, and to pay for those services each week. Such intent is sufficient evidence to support the trial court's finding that a contract existed between the parties. *Boyle, supra.* We find, therefore, that the trial court's conclusion that a

contract existed between LCA and RMS was reasonable, and was not an error of law. *C.R. by Dunn, supra; Coscia, supra.*

■ LCA also argues that the court further erred in finding that Kirk Johnson was an agent of LCA. LCA contends that Kirk Johnson had no authority to enter into agreements with other companies, even when he worked for LCA.

■ The question of whether a principal-agent relationship exists is ordinarily one decided by the trier of fact, however, where the facts giving rise to the relationship are not in dispute, the question is one which is properly decided by the court. *Joyner v. Harleysville Insurance Co.*, 393 Pa.Super. 386, 574 A.2d 664 (1990). An agency relationship is created where there is a manifestation by the principal that a person shall act for him, the person accepts the undertaking, and the parties understand that the principal is in control of the undertaking. *Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.*, 412 Pa.Super. 140, 602 A.2d 1348 (1992). Once the agency relationship is established, authorization for the agent to act on behalf of the principal can be either expressly or impliedly granted or acquired by apparent authority. *Turner Hydraulics, Inc. v. Susquehanna Construction Corp.*, 414 Pa.Super. 130, 606 A.2d 532 (1992).

■ Apparent authority arises from a manifestation by the principal that another is his agent. RESTATEMENT (SECOND) of AGENCY, § 8, comment a (1958). "The term 'apparent authority' has been broadly used by courts to describe the power which agents have in creating liability against their principals, although without authority." *Id.* at comment f. In Pennsylvania, "apparent authority" exists where the principal, by words or conduct, leads persons with whom the alleged agent deals to believe that the principal has granted the agent the authority with which the agent purports to exercise. *Turner, supra.* Apparent authority may be derived from either the course of dealing between the parties or by a single transaction. *Id.*

Here, the record discloses the following undisputed evidence. Kirk Johnson was the scalemaster at the transfer

station throughout the period in controversy, first, as an employee of Consolidated, then LCA, and finally North Penn, for the time that each operated the station. He was the main contact with whom RMS scheduled the trucks which were required each day to service the station. LCA directed that RMS send its invoice directly to Kirk Johnson in its letter of August 28, 1990, which stated:

> Effective Friday, August 31, the checks prepared for the tons hauled out the previous week (Mon–Sat) will be based upon approved invoices we receive from Kirk Johnson in Chester. You should not send invoices to Pittsburgh anymore, but rather to Kirk Johnson in Chester. Kirk will fax approved invoices to us for payment.

Although LCA presented testimony, from the vice-president in charge of the transfer station, that it was he and not Mr. Johnson who approved the invoices, the letter does not disclose this to the reader.

Secondly, the September 19, 1990 correspondence concerning the rate adjustment was sent by Kirk Johnson, and specifically states:

> Rate Adjustment, effective 9/19/90.
>
> *Per our tele* [–] *conversation* this a.m.:
>
> Rate per ton: $44.00, with minimum of 21.5 tons (43,000 lbs) per load.

The FAX was signed by RMS's president to document its agreement, but no evidence was offered to establish that anyone other than Kirk Johnson was required to approve the rate change for LCA. By such actions, LCA manifested that Kirk Johnson acted as its agent, with authority to arrange for RMS's services, to approve its invoices for payment and. to negotiate its rate adjustments. This is sufficient to hold LCA liable for Mr. Johnson's actions under an apparent authority theory. *Volunteer Fire Co., supra; Turner, supra.*

■ LCA next assigns error in the court's conclusion that LCA was liable for invoices submitted by RMS after October 19, 1990. LCA complains that impermissible hearsay evidence was the basis for the court's findings, and therefore there was

no competent evidence upon which to hold LCA liable. LCA also claims that at the time the statement was made, Kirk Johnson was no longer an employee of LCA, and therefore did not have any authority to make a binding statement that LCA was responsible for invoices. We cannot agree.

■ It is well established that an out-of-court statement offered for the purpose of proving the truth of the matter asserted contained in the declaration constitutes hearsay. *Carney v. Pennsylvania Railroad Co.*, 428 Pa. 489, 240 A.2d 71 (1968); *see also* Fed.R.Evid. 801(c). The out-of-court statement, however, is not hearsay when it is introduced merely for the purpose of establishing that the statement was made, rather than its truth. *Spotts v. Reidell*, 345 Pa.Super. 37, 497 A.2d 630 (1985). Neither is the statement hearsay if it is offered to explain a course of conduct. *Id.*

The evidence at issue here is the statement of Kirk Johnson to RMS on October 31, 1990 that the station's changes to reflect North Penn was only a "name change." Neither party asserts that the statement was offered to prove that LCA had, in fact, changed its name to North Penn. RMS offered the statement to show why it had not run its standard credit check on a new account. The statement, therefore, is not hearsay testimony. *Spotts, supra.*

The statement was contained in a FAX transmission from RMS to North Penn on November 20, 1990, wherein RMS sought to clarify which company, LCA or North Penn, was responsible for the outstanding invoices. This correspondence states that on October 31, 1990, Kirk Johnson informed RMS's traffic department to change the name on its shipping tickets to read "North Penn Recycling." Testimony from RMS's president established that Kirk Johnson also related that RMS should continue to send the invoices to his attention at the Chester station. LCA does not claim that these directives were not issued or that either of these requests would not be within the scope of the duties that Kirk Johnson would perform on behalf of LCA.

LCA's vice-president testified that LCA entered into a "private agreement" with North Penn and that LCA made no effort to notify RMS regarding the change in the operating company or that Kirk Johnson was now employed by North Penn. Accordingly, until LCA had informed it of a change, it was not unreasonable for RMS to assume either that Kirk Johnson was still acting within the scope of his employment and with the same apparent authority granted by LCA, *Turner, supra,* or that LCA had decided to operate the transfer station under a name more indicative of the type of business it was operating at the facility. It was LCA's failure to inform RMS of the change in operating companies for the transfer station which, in fact, made RMS's loss possible.

LCA next asserts that RMS waived its point of error regarding the trial court's miscalculation in its modified order since it did not present any basis for the error in any post-trial motion. LCA has misinterpreted the record. As explained above in note 4, RMS did raise the issue in a motion for reconsideration immediately upon receiving the trial court's modified order. In its initial order, the trial court awarded RMS the exact amount it claimed as damages against LCA. Until the court modified the verdict, RMS had neither reason nor opportunity to raise the issue. Hence, there was no waiver.

RMS questions whether the court erred in: 1) granting LCA's request for remittitur; 2) its calculation of the reduction of damages ordered; and 3) applying the $6,000 payment made by North Penn Recycling to reduce the liability of LCA?[6]

RMS first asks if the trial court erred in granting LCA's request for remittitur. We answer with a resounding yes, and write here in an attempt to stem the flow of the increased misuse of legal terms in our courts.

A remittitur by definition is:

**6.** LCA's final issue also concerns the $6,000 payment by North Penn on its account, so we will consider its arguments when we address the issue here.

> The procedural process by which *an excessive verdict of the jury* is reduced. If money *damages awarded by a jury* are grossly excessive as a matter of law, the judge may order the plaintiff to remit a portion of the award. In the alternative, the court may award a complete new trial or a trial limited to the issue of damages. The court may also condition a denial of a motion for a new trial upon the filing by the plaintiff of a remittitur in a stated amount.

Black's Law Dictionary, 1295 (6th ed. 1991) (citations omitted) (emphasis added). It is readily apparent, therefore, that a motion for a remittitur should only be made, and can only be granted, when there is a jury trial and verdict.

Our supreme court recently clarified the standard upon which a remittitur may be granted. In Pennsylvania, a remittitur may only be granted where the trial court determines that "the verdict so shocks the sense of justice as to suggest that *the jury* was influenced by partiality, prejudice, mistake, or corruption" and articulates the reason supporting a reduction of the verdict. *Haines v. Raven Arms,* 539 Pa. 401, 402, 652 A.2d 1280, 1281 (1995) (emphasis added). The trial court cannot simply grant a remittitur, it can suggest or recommend one to the affected party, and, if refused, the court must grant a new trial. Once the trial court determines that the jury award is excessive under the law and articulates the reasons for its determination, the award winner has the option of accepting the recommended remittitur or, in the alternative, choosing to undergo a new trial. Otherwise, the court's order is tantamount to an improper interference with the jury's verdict and would violate a person's constitutional right to a jury trial, where entitled, as guaranteed by the Seventh Amendment. As the United States Supreme Court explained in *Dimick v. Schiedt,* 293 U.S. 474, 486–87, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935),

> [t]he controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the facts.... Where the verdict is palpably and grossly inadequate or excessive, it should not be permitted to stand; but, in that

event, both parties remain entitled, as they were entitled in the first instance, to have a jury properly determine the question of liability and the extent of the injury by an assessment. Both are questions of fact. *Where the verdict is excessive, the practice of substituting a remission of the excess for a new trial* is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess—in that sense that it has been found by the jury—and that the remittitur has the effect of merely lopping off an excrescence.

*Id.* at 486, 55 S.Ct. at 301 (emphasis added).

In the instant case, we have a non-jury trial. Accordingly, LCA's motion for a remittitur was improvidently made and granted. It would defy logic to hold otherwise. We would be hard pressed indeed to find that a court could so shock its own conscience in granting an award. Rather, the appropriate procedure in a non-jury action is to move for a modification of the verdict. Thus, Judge Ross did not grant a remittitur. In actuality, the court reconsidered its original decision, recalculated the amount of damages and modified its original verdict, despite the use of the word remittitur in both LCA's motion and the trial court opinion.

▮▮▮▮▮ This brings us, appropriately, to RMS's next question: did the trial court err in its recalculation of the damages? It is well-established that this court, on appeal, will not substitute its judgment for that of the fact-finder in the award of damages so long as the award is supported by competent evidence and the proper application of the law. *In re Estate of Cornell,* 336 Pa.Super. 594, 486 A.2d 424 (1984).

The trial court found that RMS had actual notice that North Penn was the party responsible for payment for RMS's services on November 13, 1990. The court also determined that LCA, due to its failure to notify RMS of the change, was liable for the invoices from October 23 through November 13, 1990. The record discloses during that period there were thirty-one invoices, numbered 8686 through 8699 and 9020 through 9036, totalling $30,279.48.

This information was found in Plaintiff's Exhibit # 6. The problem arose because several of the invoices appear on more than one page. It is assumed that the court attempted to deduct the invoices dated November 14 through November 19, 1990 from its initial award of $34,042.62. Starting on page two of Exhibit # 6, the invoices numbered 9037 through 9046 were issued during those six days and total $9,763.16. It appears that the court continued to page three of the exhibit, where these same invoices and several from November 13, 1990 were repeated, and the resulting mathematical error doubled the amount by which the court sought to amend the verdict. The amended amount is the result of a mistake in calculation, and is therefore not supported by competent evidence, *Cornell, supra.* Accordingly, we vacate the modified order.

In the final issue raised in this appeal, both parties question how the $6,000 payment by North Penn should be applied. RMS established at trial that the payment was received on November 20, 1990, and was applied to the oldest balance on account. RMS asserts that the trial court found that North Penn was liable for the invoices after November 13, 1990, and accordingly, the $6,000 payment should be credited to that amount and not to the amount for which LCA was found to be liable. LCA, on the other hand, argues that RMS would then receive an impermissible double recovery. We must agree with RMS.

It is well settled that an award of compensatory damages is meant to compensate an innocent party for the injury suffered; "the loss sustained should be compensated with the least burden to the wrongdoer consistent with the idea of *fair* compensation to the injured." *Feingold v. Southeastern Pennsylvania Transportation Authority,* 339 Pa.Super. 15, 28, 488 A.2d 284, 291 (1985) (quoting *Incollingo v. Ewing,* 444 Pa. 299, 307, 282 A.2d 206, 228–229 (1971)). Accordingly, we must determine which application of the money would most fairly compensate RMS in light of the actions of the wrongdoer leading to the injury.

We previously stated that it was LCA's failure to notify RMS that North Penn had taken over the operation of the transfer station which led to RMS's loss. RMS presented testimony that it would routinely do a credit check on its new accounts and would establish a line of credit for the company based on the information obtained. Obviously, this procedure would operate to limit the losses RMS might suffer in providing services to an account that was not financially stable. We conclude, therefore, that the fairest application of the money is one which would limit the loss in a manner similar to that which would have been effected if RMS had the proper notification.

The trial court found that LCA was liable for the unpaid invoices from October 23, 1990 through November 13, 1990, the date when RMS had actual notice that North Penn was an entity separate from LCA. The total of the invoices for this time period is $30,279.48. The invoices for the week of November 13 through November 19, 1990 total $9,763.16. If we credit the $6,000 payment against the amount owed by LCA, RMS's loss will be $15,763.16. If, however, we apply the $6,000 payment to the balance owed by North Penn, the loss to RMS will be reduced to $3,763.16. We discern no double recovery as contended by LCA.

Application of the $6,000 to the amount owed by North Penn, while it does not totally compensate the plaintiff, does limit the loss which RMS must suffer from North Penn's insolvency. This result most nearly reflects the goal of RMS's procedural credit check, which would have been effected had LCA properly notified RMS of the change in operating companies. Additionally, LCA should not benefit from the inadvertent "windfall" of the payment, simply because the computer mindlessly applied the payment to the invoices for which LCA is responsible. We determine that application of the payment to North Penn's liability, therefore, most fairly compensates RMS for its injury, and does not overly burden LCA. *Feingold, supra; Incollingo, supra.*

Accordingly, we affirm the decision of the court relating to LCA's liability on a contract, and vacate the order of the court

with regard to the damages. We also remand the case to the trial court to enter an order in accordance with this opinion, which includes the interest from the original order.

Order affirmed in part, vacated in part, and remanded.

Jurisdiction relinquished.