683 A.2d 1254

Michael S. HUTCHISON, Jr., by Mary J. HUTCHISON,
Parent and Natural Guardian

v.

Father Francis LUDDY, St. Therese's Catholic Church, Bishop
James Hogan and Diocese of Altoona–Johnstown.

Appeal of ST. THERESE'S CATHOLIC CHURCH, Bishop
James Hogan and Diocese of Altoona–Johnstown.

Superior Court of Pennsylvania.

Argued Jan. 9, 1996.

Filed Sept. 4, 1996.

Reargument Denied Nov. 15, 1996.

See also, 538 Pa. 484, 649 A.2d 435.

Carl A. Eck, Pittsburgh, for appellants.

Richard M. Serbin, Altoona, for Michael S. Hutchinson, Jr., for appellee.

Before TAMILIA, FORD ELLIOTT and BROSKY, JJ.

BROSKY, Judge.

This appeal is from the judgment entered on a verdict following a jury trial. A verdict was entered in favor of appellee, Michael S. Hutchison, Jr. (Michael), and against all appellants. The jury awarded the amount of $519,000.00 in compensatory damages, the sum of $311,564.11 as delay damages, and punitive damages in the amount of $50,000.00 against Fr. Francis Luddy (Luddy) and $1,000,000.00 against St. Therese's Catholic Church (St. Therese), Bishop James Hogan (Bishop Hogan) and the Diocese of Altoona–Johnstown (the Diocese).[1] Following the denial of post-trial Motions, judgment was entered on the verdict, and this appeal timely followed.[2]

Appellants raise a number of issues, to-wit:

(1) Whether the trial court erred in allowing Michael to proceed under the theory set forth in Restatement (Second) of Torts § 317 for negligent hiring, supervision and retention of Luddy by appellants.

[1]. St. Therese, Bishop Hogan and the Diocese will be collectively referred to as "appellants".

[2]. Luddy is not a party to this appeal. He filed a separate appeal to this court which is docketed at No. 1452 Pittsburgh, 1994. On September 21, 1994, this court entered an Order consolidating the instant appeal with that filed by Luddy for the purpose of argument but ordered separate briefing. On September 7, 1995, this court entered an Order severing the two appeals.

(2) Whether the trial court erred in allowing Michael to proceed on a theory of a pattern, practice or custom of appellants to ignore or to fail to investigate and remedy allegations of molestation.

(3) Whether St. Therese knew of Luddy's pedophilic disposition and failed to warn potential victims.

(4) The admissibility of the failure of appellants to report molestation incidents to the authorities.

(5) Whether the trial court erred in allowing evidence of sexual molestation committed by other members of the clergy against other victims, by Luddy against other victims and by Luddy against Michael.

(6) The propriety of the injection of the defense of comparative negligence against Michael.

(7) Whether the jury instruction and jury interrogatory on causation were sufficient to enable the jury to decide if Michael consented to the acts in question in order to obtain money.

(8) Whether the verdict form was erroneous because it requested the jury to itemize elements of Michael's damages.

(9) & (10) Whether the evidence was sufficient to warrant the imposition of punitive damages against all appellants.

We vacate the judgment entered on the damage awards against St. Therese, Bishop Hogan and the Diocese and discharge them from liability.

This unfortunate situation had its genesis in a series of sexual molestations of Michael which began when he was ten or eleven years old and which lasted until he was seventeen years of age by Luddy when the latter served as a parish priest.[3] St. Therese was located within the jurisdiction of the Diocese, and Bishop Hogan served as the Bishop of the Diocese at the time of the incidents in question. However, at

---

**3.** Michael agrees that only two such incidents survive the bar of the statute of limitations—one which occurred in early 1983 when Michael was fifteen years of age and and the other which took place late in 1984 when he was seventeen years old.

the time of the two incidents which survive the bar of the statute of limitations, Luddy was serving at St. Mary's Church in Windber, Pennsylvania.[4]

Appellants first assert that the trial court should not have permitted Michael to proceed under the theory set forth in Restatement (Second) Torts § 317 for the negligent hiring, supervision and retention of Luddy by appellants. Section 317 states:

**Duty of Master to Control Conduct of Servant**

**A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if**

**(a) the servant**

**(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or**

**(ii) is using a chattel of the master, and**

**(b) the master**

**(i) knows or has reason to know that he has the ability to control his servant, and**

**(ii) knows or should know of the necessity and opportunity for exercising such control.**

(Underlined emphasis supplied). However, the theory set forth under Section 317 is inapplicable to the facts at hand. At no time within the applicable limitations period[5] did Luddy commit, upon any premises in the possession of St. Therese, Bishop Hogan or the Diocese, the acts of which Michael now complains. Instead, these encounters occurred at the Townhouse Motel in Altoona. We feel confident in saying that the Townhouse Motel is not a premise which was in the possession of St. Therese, Bishop Hogan or the Diocese. Motels and hotels are not establishments which would be typically pos-

**4.** St. Mary's Church was not a party-defendant in this action.

**5.** See 42 Pa.C.S.A. § 5524.

sessed by these appellants to fulfill religious or priestly functions or to further the purposes of the Roman Catholic Church.

Section 317 does impose liability upon the Master for acts of the servant committed outside the scope of the servant's employment. No doubt exists that Luddy, while engaging in these acts of sexual molestation, was acting outside the scope of his priestly duties. The activity of which Michael now complains is wholly inconsistent with the role of one who is received into the Holy Orders as an ordained priest of the Roman Catholic Church. Michael testified that he ran away from his home in Ohio. When he returned to Altoona, where he had previously lived with his family, he sought out Luddy, who was his Godfather, because he needed money, which he received, at least on one occasion, in exchange for sexual favors to Luddy. That such nefarious conduct falls outside the scope of Luddy's employment as an ordained servant of the Roman Catholic Church is a conclusion which may be readily derived from a mere application of common sense.[6]

However, while Section 317 does apply to impose liability upon the master for acts of the servant committed outside the scope of the latter's employment, the occurrence of such acts here fails to meet the initial threshold of Section 317(a)(i).

Judgment against St. Therese, Bishop Hogan and the Diocese vacated. St. Therese, Bishop Hogan and the Diocese are discharged from liability.[7] Jurisdiction relinquished.

**6.** The dissent states that we have not considered the language following the emphasized text of Restatement (Second) Torts § 317(a)(i). *See* pp. 421–422 of Majority Memorandum. Our response is that although Luddy may have been privileged to enter a room at the Townhouse Motel for the purpose of providing pastoral care and guidance to a troubled person seeking such care and guidance, he certainly was not privileged to enter the motel room as a servant of either the Diocese, St. Therese or Bishop Hogan for the purpose of engaging in sexual misconduct or other such improper behavior.

**7.** In light of our disposition, we need not address the other issues raised, as they all flow from appellants' defense to their liability for the negligent hiring, retention and supervision of Luddy.

TAMILIA, J., concurs in the result.

FORD ELLIOTT, J., files a dissenting opinion.

FORD ELLIOTT, Judge, dissenting:

I must respectfully dissent from the majority's decision to grant judgment n.o.v. on the basis that Section 317 is inapplicable to the facts at hand. Following my review of the record, I believe that appellee has set forth a valid cause of action under § 317. In their first issue, appellants ask:

1. Whether the court erred in allowing the plaintiff to proceed through discovery and trial under the Restatement (Second) of Torts, § 317 (1965), for the negligent hiring, retaining and supervision of Father Luddy when the record showed that the molestations occurred in a motel off the premises of the Diocese *and there was no proof that Father Luddy was privileged to enter the motel solely because he was employed as a priest* and when allowing any such action to go forward would result in excessive entanglement of the courts in the religious affairs of the Diocesan Parties?[1]

Appellants' brief at 2 (emphasis added). As the majority indicates, Section 317 of the Restatement provides:

## § 317. Duty of Master to Control Conduct of Servant

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master *or upon which the servant is privileged to enter only as his servant,* or

(ii) is using a chattel of the master, and

(b) the master

---

1. Appellants have set forth the issue of excessive entanglement; however, they have failed adequately to develop this issue. I will, therefore, not address it.

(i) *knows or has reasons to know* that he has the ability to control his servant, and

(ii) *knows or should know* of the necessity and opportunity for exercising such control.

Restatement (Second) Torts § 317 (1965) (emphasis added). At trial, appellee proceeded on the theory that with regard to the 1982 and 1984 incidents at the TownHouse Motel, Father Luddy was privileged to enter appellee's room because of his status as a priest and his role as appellee's spiritual advisor. *See* § 317(a)(i). The majority does not address this issue. Instead, it highlights those words in § 317 that require the incident to occur on the master's premises, without noting the "or" that follows. (Majority opinion at 421–424.) After a painstaking review of the record, I conclude that a jury could have found that appellee met with Father Luddy at the TownHouse Motel because Father Luddy was his spiritual advisor.

The majority observes that Father Luddy was clearly acting outside the scope of his priestly employment when he molested Michael, because such conduct plainly falls outside the parameters of priestly behavior. (Majority opinion at 423–424.) Obviously, the majority is correct. Father Luddy's behavior was not that of a priest, rather Father Luddy was a pedophile in priestly clothing. However, the issue is *not* whether Father Luddy was acting within the scope of his employment; if he were, § 317 would not apply at all. Rather, the issue is whether appellee perceived of Father Luddy in his role or identity as a priest when appellee called Father Luddy in 1982 and 1984, and whether Father Luddy took advantage of appellee's perception, and the trust and confidence it inspired in this boy, to lure him into a sexual relationship. From the evidence adduced at trial, the jury could have so concluded. As a result, I would not hold, as does the majority, that the findings of the jury do not support the trial court's legal conclusion that appellee established his claim under the first prong of § 317. *See Refuse Management Systems, Inc. v. Consolidated Recycling and Transfer Systems Inc.*, 448 Pa.Super. 402, 412, 671 A.2d 1140, 1145

(1996) ("An appellate court has the authority to determine whether the findings of the trial court support its legal conclusions, and may interfere with those conclusions only if they are unreasonable in light of the trial court's factual findings."). A summary of relevant testimony before the jury is as follows.

By the time the two incidents in question occurred, appellee testified that he had been involved in a sexual relationship with Father Luddy for at least four years, from the time he was eleven. (R.R. at 1950.) According to appellee's testimony, he had been molested approximately 50–75 times in Father Luddy's rectory bedroom. (R.R. at 2203.) All of these events occurred in the context of a priest/pupil relationship; Father Luddy was the religion instructor for the three oldest Hutchison boys' and often took them out to eat after religion classes on Saturday. (R.R. at 754.) Father Luddy testified that he took appellee and his brothers to lunch frequently at the TownHouse Motel. (R.R. at 756.) He also entertained the boys in his room in the rectory, allowing them to come up and watch television. (*Id.*) He even became the boys' godfather when they were baptized and, in that role, would call the boys' mother and ask to take the boys out to dinner or to visit his friends. (R.R. at 1409–11.) Appellee testified that he and his brothers traveled with Father Luddy and stayed in a motel in Johnstown with him while attending a wedding. (R.R. at 1814–15.) Father Luddy would often buy the boys presents for their birthdays, or candy and other treats. (R.R. at 1815.) As set out by appellee, throughout his dealings with his molester, appellee always referred to him as *Father* Luddy.

As a result, by the time appellee was fifteen, when the first incident at issue occurred, he was in the habit of turning to Father Luddy for advice and counsel, as well as for "nice things" such as trips and eating out, all of which were inextricably intertwined with the sexual relationship. Nevertheless, appellee testified that when he called Father Luddy the first time after hitch-hiking to Altoona, he specifically requested that the two not engage in sex. (R.R. at 1783.)

In addition to appellee's testimony as to the events in 1982 and 1984, appellee introduced into evidence the testimony of

other boys who had been victimized by Father Luddy, who used the same pattern of befriending the boys, luring them and their families into a sense of trust, and then molesting the boys. For example, Father Luddy admitted molesting appellee's brother Mark hundreds of times over a period of more than four years. (R.R. at 765–792.) Father Luddy also testified that he took Mark on trips to Spain, France, and Morocco at his own expense. (R.R. at 776, 782.) Other victims of Father Luddy also testified to traveling with Father Luddy and staying in motels with him. One boy went to Puerto Rico twice with Father Luddy, on a trip paid for by the boy's parents, during which Father Luddy molested the boy repeatedly. (R.R. at 666–671.) Another boy stayed in a Holiday Inn in Latrona[2] Heights with Father Luddy when the priest took the boy to visit Father Luddy's sister in a convent there. (R.R. at 660.)

From all of the foregoing, a jury could have found that Father Luddy used his identity and status as a priest to engage in a pattern or practice of befriending young boys who attended the parochial school, or who were in catechism classes, or who were altar boys, by taking them out to meals, doing "nice things" for them such as taking them shopping or on trips, and then, after establishing a trusting relationship with the boys and their families, molesting the boys. Father Luddy admitted that he knew Mrs. Hutchison trusted him with Mark and was happy for the priest's interest and concern for her sons. (R.R. at 783.) Father Luddy also admitted that he knew each of the boys respected him as a priest and as their godfather, that they had grown to love him, and that Mark had confided he did not have a close relationship with his step-father. (R.R. at 766.)

As a result of the foregoing, and viewing the evidence in the light most favorable to appellee as the verdict winner, a jury could have found that appellee established his claim that he met with Father Luddy and was at the TownHouse Motel because of Father Luddy's status as the boy's priest/confidant.

---

**2.** This word appears as "Natrona" Heights at other places in the record.

Father Luddy's presence at the TownHouse Motel was in his role as a priest whether or not he thereafter abused his holy office. Appellants focus on the fact that Father Luddy gave appellee $200 after the incidents in question, thereby raising the inference that appellee, who had worked as a male prostitute, came to Altoona to engage in sex for money. (*See* R.R. at 1822, 1871–72, 1881–1884, 2168–70, 2183.) The jury could, however, have believed that Father Luddy gave appellee the money to help him out, as he had so often helped him in the past.

In addition, as the trial court noted, Bishop Hogan observed in his video deposition, "I don't care where you are. If you're a priest, you're a priest 24 hours a day, every day of the year, and month, year, yes." (R.R., Relevant Opinions and Orders at 56, *quoting* Deposition of Bishop Hogan, 9/28/88 at 139.) Because I would find sufficient evidence to support a claim under the first prong of § 317, I cannot agree with the majority that the trial court erred when it allowed this claim to go to the jury.

While the majority does not address the second prong of a § 317 claim; namely, that the master knows or has reason to know that he has the ability to control his servant, and knows or should know of the necessity and opportunity for exercising such control, nevertheless, finding sufficient evidence to support this prong as well, I would find no trial court error on this basis, either. Our supreme court has analyzed the second prong of a § 317 claim as follows:

> To fasten liability upon an employer under Section 317, it must be shown that the employer knew or, in the exercise of ordinary care, should have known of the necessity for exercising control over his employee. Many years ago— prior to the promulgation of Section 317—the United States Supreme Court in *Fletcher v. Baltimore & Potomac R. Co.*, 168 U.S. 135, 18 S.Ct. 35, 42 L.Ed. 411 (1897), held that, if by reason of neglect to perform its duty to see that its employees do not act in a manner dangerous to other persons, an act is performed by an employee outside the scope of his employment and such act is one of a series of

the same kind of acts of which the employer had knowledge and in which it acquiesced and, if such act of the employee is in its nature dangerous, then the employer is liable to one injured by its employee....

Two inquiries arise in the case ... in determining whether the evidence of record suffices to satisfy the requirements of Section 317: (1) what was [the employee's] conduct prior to [the incident at issue] and was it of such nature as to indicate a propensity for [danger to others]? (2) did [the employer] know or, in the exercise of ordinary care, should it have known of [the employee's] prior conduct?

*Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 570–71, 246 A.2d 418, 422 (1968).

Applying this test to the facts instantly, appellee established the supervisory chain of responsibility as follows. According to Bishop Hogan, the pastor is the ultimate authority within his parish, answerable only to the Bishop. The Bishop added that he would expect something serious, such as an allegation of sexual molestation, to be brought to his attention. (R.R. at 3740–41.) He further testified that, as a general rule, he preferred to deal with problems of deviant sexual behavior himself, rather than submitting them to the Personnel Board. (R.R. at 3742–43.)

According to this chain of supervision, and again viewing the evidence in the light most favorable to appellee as verdict winner, the diocese had actual notice of Father Luddy's problem as early as 1967–69, when Father Luddy molested a fourteen or fifteen-year old boy, D.S.,[3] twice, once in the St. John's Cathedral rectory and once in Geesey Park, and D.S. reported the molestations to Father Louis Mulvehill. (R.R. at 2281–82, 2284–85, 2286–89, 2308.) At the time, Father Mulvehill was the pastor of St. Mark's. Father Luddy, who was ordained in 1967, was on his first parish assignment with Father Mulvehill. (R.R. at 6469.) As a result, Father Mulvehill was Father Luddy's superior. (R.R. at 2289, 6455.) Ac-

---

**3.** I am not using the names of Father Luddy's victims in order to protect them and their families from further, and unnecessary, embarrassment and humiliation.

cording to Father Mulvehill, it was his duty to supervise his associate pastors. (R.R. at 6495–96.) D.S., who was an altar boy, also attended the diocesan school. (R.R. at 2274.) According to D.S.'s testimony, Father Mulvehill assured D.S. the situation would be taken care of. (*Id.*)

While Father Mulvehill denied that he received any complaints from anyone, including D.S., about Father Luddy (R.R. at 6476, 6483–84, 6615–16), the jury was free to disbelieve his testimony. *Randt v. Abex Corp.*, 448 Pa.Super. 224, 233, 671 A.2d 228, 233 (1996) (a jury is free to believe any part of a witness's testimony that they choose, and may disregard any portion of the testimony that they disbelieve), *citing Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888 (1990). In addition, by his own admission, Father Mulvehill testified it would be his duty to report any instances of molestation that were *admitted.* (R.R. at 6624 (emphasis added).) If such an accusation had been made, Father Mulvehill testified he would have brought the priest in to explain himself; if the priest denied the accusation, it would have been dropped, whereas, if the priest admitted the molestation, the incident would have been reported to the Bishop. (R.R. at 6484.) While Father Mulvehill later amended this response, adding that he would have also interviewed the family to determine what, if anything, had happened (R.R. at 6621), nevertheless the jury could have found that Father Mulvehill tended to believe the priest if he denied the accusation.

From all of the foregoing, and viewing the evidence in the light most favorable to appellee as verdict winner, the jury could have found that the diocese, through Father Mulvehill, knew that Father Luddy was molesting boys as early as 1969. Had Father Mulvehill acted promptly and properly, he would have reported the incident to Bishop Hogan, who would then have had an opportunity to deal with Father Luddy.

The jury also could have believed that Monsignor Kline knew or should have known of the necessity of exercising control over Father Luddy while he was a priest at St. Therese's, where he first seduced the Hutchison brothers. Monsignor Kline was Father Luddy's pastor; therefore, he

had a duty to supervise Father Luddy. (R.R. at 6495–96.) During his tenure at St. Therese's, Father Luddy admitted that he sexually molested Mark Hutchison hundreds of times in the rectory he shared with Monsignor Kline. Appellee testified that Father Luddy molested him 50 to 75 times in the same rectory. Father Luddy also testified that he saw Monsignor Kline on at least one occasion when he was taking the Hutchison brothers up to his private quarters. (R.R. at 755–56.) Appellee likewise testified that he made eye contact with Monsignor Kline when he was alone with Father Luddy in the rectory on at least one occasion. (R.R. at 1801.) From the foregoing, and again viewing the evidence in the light most favorable to the verdict winner, the jury could have found that Monsignor Kline knew of Father Luddy's improper behavior, and as a result had a duty to investigate. Had he done so, the relationship that culminated in the two incidents at issue instantly would very probably have ended before 1982.

As the comment to § 317 of the Restatement observes, "[T]he master may subject himself to liability under the rule stated in this Section by retaining in his employment servants who, to his knowledge, are in the habit of misconducting themselves in a manner dangerous to others." (Comment c, Restatement (Second) of Torts § 317 (1965).) From all of the testimony adduced at trial, a jury could have so found.

As to the punitive damage award, however, I must agree with appellants that the evidence was insufficient as a matter of law to support such an award, and that judgment n.o.v. should therefore be granted. According to our supreme court, "[p]unitive damages are appropriate to punish and deter only extreme behavior, and, even in the rare instances in which they are justified, are subject to strict controls." *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 169, 494 A.2d 1088, 1096 (1985) (plurality opinion). *See also Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984). Under Pennsylvania law:

'[p]unitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a *reckless indifference* to the interests of others.' *Chambers v. Montgomery*, 411 Pa. 339, 344, 192 A.2d 355, 358 (1963)

(quoting comment *b* to Section 908[1] of the Restatement of Torts) (emphasis added). *See Feld v. Merriam,* 506 Pa. at 393–95, 485 A.2d at 747. Comment *b* to Section 500, read in light of preceding comment *a* to that section, indicates that Section 908 damages are not justified where the defendant's mental state rises to no more than gross negligence.

*Martin, supra* at 171–72, 494 A.2d at 1097–98. Additionally, our supreme court has held that "[p]unitive damages must be based on conduct which is ' "malicious," "wanton," "reckless," "willful," or "oppressive" ' ..." *Feld, supra* at 383, 485 A.2d at 747, *quoting Chambers, supra* at 344–45, 192 A.2d at 358 (other citations omitted).

Utilizing this standard, our supreme court has vacated awards of punitive damages for the conduct of an asbestos manufacturer which failed to place warnings on its product even though there was evidence to establish that they knew the products were harmful. *Martin, supra.* Likewise, the conduct of the owners of an apartment complex who failed to institute security measures when they were aware of the dangers posed to their tenants was found to be insufficient to warrant punitive damages. *Feld, supra.* Using these cases as a baseline, I must conclude that, while there was ample evidence presented in the instant case that the conduct of the Diocese was inept, exhibited a complete lack of understanding of the disease of pedophilia, and constituted gross negligence, I cannot find that the evidence was sufficient as a matter of law to show that the conduct of the Diocese rose to the level of being malicious, wanton, or based on any evil motive.

As a final point, I note that the evidence relied upon by the appellee and the trial court for a finding of outrageous conduct involves the policy and practice of the Diocese in failing to investigate and resolve properly instances of pedophilic misconduct by priests. To support this claim, appellee was permitted to introduce various incidents involving the sexual misconduct of other priests, and to describe the way in which the Diocese addressed these incidents. Because I am writing in dissent, I have chosen not to deal with other trial court errors posed by appellants. I will, however, respond briefly to

appellants' argument that there is no cause of action in Pennsylvania based solely on a policy or practice of the Diocese.

While I agree with this general proposition, nevertheless, my reading of appellee's complaint satisfies me that he proceeded on two separate and more direct theories; a claim based on § 317, and another claim based on the failure of the Diocese to investigate claims of sexual molestation by its priests, specifically including Father Luddy. Because of the way in which the trial court characterizes the second claim in its opinion denying post-trial relief, and because of my concern with the trial court's charge to the jury on the second claim, however, I do not reach the issue of whether two separate and distinct claims existed.

The trial court charged the jury as follows:

That's pretty much our pattern as we 1, 2; 3, 4; 5, 6 and that continues with 7 and 8[4] because as to Bishop Hogan and the Altoona–Johnstown Diocese, in addition to this negligent supervision and retention theory involving the incidents at the TownHouse Motel there is also an allegation in the case that plaintiff made that during the relevant time period, which is being 1967 up until 1984, from Bishop Hogan becoming Bishop up through these two events, there existed in the Diocese of Altoona–Johnstown a custom or policy of failing to receive, investigate, or act on complaints of sexual misconduct by priests against minor males. To find for the plaintiff under this cause of action you must determine if the evidence demonstrates deliberate indifference or tacit authorization by diocesan officials, including clerics and priests, of the offensive acts by failure to take remedial steps following notice by such acts by its agents or subordinates. Thus to find for the plaintiff on this claim you must find that the Diocese had notice of sexual misconduct of its priests with minor males and deliberately failed to act on this knowledge.

4. These numbers refer to jury interrogatories.

And if you look at Questions 7 and 8, again, this is framed for you. 'Do you find—here's your first question, that Bishop Hogan and/or the Diocese of Altoona–Johnstown had a policy or practice of ignoring or failing to investigate or otherwise handle claims that priests assigned within the Diocese engaged in pedophilic activities with minor males?' Did they have that practice in spite of the fact that they knew that this was going on? That's Question 7. Then Question 8 again gets us back to substantial factor. 'Do you find that this policy or practice was a substantial factor in bringing harm to Plaintiff, Michael S. Hutchison, Jr.?' If you answer yes to both of those questions, then you would've found that they were liable for compensatory damages on that theory. So there's two different ways you can find the Bishop and the Diocese liable and whether you find them liable as to one, liable as to both, liable as to neither, of course that's your decision, but you have two separate considerations. One as to the question of the policy. Okay? Are we together on it?

R.R. at 9661–62.

Clearly, this charge indicates that the claim went to the jury as a claim for compensatory damages. Based on this charge, appellants may well be correct in claiming that although the verdict indicates the jury believed that such a policy existed and that it caused substantial harm to appellee, the charge does not require the jury to indicate in its verdict how the policy *caused* the harm; specifically, how the policy enabled, or allowed Father Luddy to do what he did. On this basis, such an error in the charge might well require a new trial.

In addition, in its opinion, the trial court takes the position that this claim was only submitted to the jury on the issue of punitive damages, and not as a separate claim upon which liability would lie. While this is an interesting approach to the issue at hand, based on my disposition of the punitive damages issue, I would find error not only because the claim was in fact not submitted to the jury as a punitive damages claim, but also because the punitive damages claim should not have been submitted to the jury at all. While under other circum-

stances, the confusion surrounding this whole issue might well warrant the grant of a new trial, nevertheless, because the result espoused by the majority is a judgment n.o.v. as to all liability, I respectfully dissent.