Brown, Appellant, *v.* Shirks Motor Express.

Argued May 27, 1958. Before Jones, C. J., Bell, Musmanno, Arnold, Jones and Cohen, JJ.

*W. Burg Anstine,* with him *Robert I. Shadle,* and *Anstine, Shadle & Griest,* for appellant.

*Arthur Markowitz,* with him *Lewis P. Sterling,* and *Markowitz, Liverant, Rauhauser & Kagen,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 30, 1958:

On February 3, 1955, the plaintiff, Wayne R. Brown, was flung by the spinning wheels of a tractor-trailer into the restricted space of eight inches between the top of the tires and the body of the trailer, where, through the continued revolving of the wheels, he sustained grave injuries which included crushed facial bones, fractured jaw, stripping of teeth, optical damage, disfigurement, shock, extended hemorrhage, and mutilation. He brought suit against the owner of the tractor-trailer, Shirks Motor Express, and the jury returned a verdict in his favor in the sum of $56,200. The defendant moved for judgment n.o.v., which was granted by the Court of Common Pleas of York County, and the plaintiff has appealed.

It is a rule so well established that it seems almost unnecessary to cite it, that in an appeal of this kind, we are required to read the record in the light most favorable to the verdict-winner.* With that criterion in mind, there emerges from the 375-page printed transcript the following narrative of fact. Wayne R. Brown, the plaintiff, was a mechanic employed by the International Harvester Garage of York, which undertook to repair the "fifth wheel" of a tractor-trailer, owned by Shirks Motor Express, also of York. The fifth wheel of a tractor-trailer is, contrary to colloquial parlance, not a superfluity but a very vital piece of equipment. Looking something like a tilted sun dial, it rests on the chassis of the tractor and performs the function of holding the trailer to the tractor. After this device had been repaired by International Harvester, the tractor

---

*\*Wermeling v. Shattuck,* 366 Pa. 23.

was delivered to the terminal of Shirks Motor Express where the trailer was to be attached.

Wayne R. Brown, who had done the repair work on the fifth wheel, was accompanied by another employee of International Harvester, Norman Crone, to the Motor Express terminal where they discussed with John D. Sherman, the driver of the tractor, the attachment of the trailer to the tractor. Sherman backed the tractor into the trailer and, although connection was effected, it developed that the bond between the two vehicles was not a secure one. The front end of the trailer, which was not the one which normally travelled with this tractor, did not stand as high as the regular Shirks trailer and, as a consequence, there was the likelihood that after a journey had been begun, the trailer might disconnect en route. Brown informed Sherman of this danger and asked him to leave the cab of the tractor and to come back to look at the problem they were facing. Sherman got down from the tractor and the three men stood on the road to discuss the situation. Brown informed Sherman that since the fifth wheel was loose on the frame it would be necessary to return to the shop where "we could get some light and some heat on the plate to repair it." Sherman replied that he would not move the tractor with the trailer attached; and Brown and Crone thus prepared to unlatch the trailer by releasing the locking mechanism.

The lever of the locking device, however, had slid back with the fifth wheel to a point "almost behind the tires," thus making it difficult of access and manipulation. When the tractor and trailer are joined together, there is practically no space between the two vehicles since the front end of the trailer sits on the fifth wheel, bringing the dual rear wheels of the tractor directly beneath the nose of the trailer. Brown reached into this slender opening between tractor and trailer and

tried to pull the releasing lever which, however, refused to yield. Standing close to the double wheels he now took hold of the edge of the body of the trailer, so as not to trip or fall, and placed his right foot against the lever while Crone pulled on it. It was while both men were engaged in this operation, that a tragic situation developed.

Suddenly the wheels of the tractor began to revolve in reverse, and Brown fell into the tires, which seized his clothing, lifting him off the ground and thrusting him toward the eight-inch crevice between the top of the tires and the bottom of the overlapping trailer. Fighting a losing battle against the spinning wheels, Brown was carried by centrifugal force to the metallic alcove above the tires. Here he stuck while the wheels, continuing to spin, ground him into the metal of the trailer, smashing his face, knocking out his teeth, and churning into his chest. The propulsion of the wheels jammed him into the eight-inch slot so tightly as to slacken the speed of the tires burning against his body. Crone was now calling out: "Brown's in the wheels," and the wheels stopped turning. Brown felt somebody tugging at his body to pull him loose, but he had been wedged into the aperture so fast that he could not be moved. Somebody now said: "We'll have to spin him out." Brown lowered his head in between the two tires so, as he explained later, "when they spun me out, they wouldn't pull my head clear off." The wheels now spun forward, Brown's body was dislodged and it was flung forward and down to the ground.

Who set the wheels in motion when Brown was standing in the obviously dangerous position between tractor and trailer? There is no mystery about this phase of the case. Sherman admitted that it was he who threw the wheels into reverse gear. The real question is: Who, if anybody told him to move the

tractor? Sherman stated at the trial that he received an order to this effect from either Brown or Crone. Both Brown and Crone denied that they had given Sherman any such order.

We repeat: Who, if anyone told Sherman to back up the tractor? The answer to that question is the "fifth wheel" on which the judgment in this case depends. In the line of completely exculpating the defendant's driver from all blame in this respect, defendant's counsel asked him: "Would you please state now for the Court and the jury whether or not you moved the tractor or caused the operation of its wheels to move in any direction at any time other than on a command or an order?" Plaintiff's counsel objected to the question as being leading, but the Trial Judge overruled the objection. A leading question is one which suggests the answer. This question did more than suggest the answer; it flashed the answer to the witness as plainly as if a printed sign carrying the word "No" had been lifted before his eyes. And the witness accordingly answered with that precise negative.

However, in spite of this all-inclusive No, the jury concluded from the evidence in this case that the true answer was Yes. The lower court disagreed with the jury's verdict and reversed it. The learned Trial Judge, speaking for the court en banc, said that the plaintiff and Crone contended that the "wheels started revolving in reverse suddenly and without warning, when they both were in a place of danger." To this contention, the court replied: "This was plaintiff's theory of the case and if it were substantiated by the testimony we would have no further difficulty with this phase of the situation, but we have searched the testimony in vain for such statements." But we encountered no difficulty in finding testimony to support the plaintiff's contention as above indicated. Brown testified that Sherman

was standing by the side of the tractor-trailer when he (Brown) began to work on the fifth wheel. He did not see Sherman leave, nor did he communicate with Sherman from that moment: "Q. Did you see Sherman move from that spot? A. No, I didn't. Q. State whether or not there was anything further said between you and Sherman from that point on? A. No, I said nothing to him."

Crone testified to the same effect: "Q. Now where was Sherman while you and Brown were working on the lever, where was he? A. I think he was still outside then. Q. Standing where the three of you were? A. That's right. Q. State whether or not anything further was said that you know of between you or Brown and Sherman from that time on? A. I didn't hear anything. Q. Did you see Sherman leave that position? A. No, I didn't."

Since Sherman admits that it was he who moved the tractor and since Brown and Crone have stated they gave no order or signal to Sherman to do so, the only conclusion possible from the evidence, in view of the verdict, is that Sherman threw the tractor into operation of his own volition. Although Sherman said he heard Brown or Crone telling him to start the tracttor, he admitted that he gave no warning or signal before he actually began to move.

Sherman's attitude at the trial was one which could easily convince the jury that he in fact did fail to give the warning expected of any driver who is moving a heavy vehicle when one or more persons are standing close to the wheels. At one point he testified as follows: "Q. Where was Brown when these orders were given? A. I don't know. Q. Could he have been under the truck? A. I got orders to pull forward. *If he was under the truck that was his business."* (Emphasis supplied.)

The accident occurred at night (11:30 p.m.), with Brown working only by the illumination of a flashlight. Sherman could have been convicted of negligence on the fact alone that, according to his own statement, he moved his cumbersome equipment back and forth without seeing the men or making any attempt to look for them: "Q. When that latch order was made, where was Brown? A. I don't know. Q. Where was Crone? A. I don't know. Q. Did you look to see where they were? A. I looked out the window and I couldn't see them. . . . Q. And Brown and Crone would have been where when you looked out? A. I didn't see them. They must have been back in here (indicating) somewhere. . . . Q. And you couldn't see them any way? A. No. Q. Did you call for them? A. No, sir. . . . Q. You mean you got orders and you didn't look to see whether these men were in a position of safety or not? A. I couldn't see. . . . Q. Did you look to see where these men might be when you backed up? A. I looked out the window and I couldn't see anybody, the right window . . . Q. Now this is the second time that you got out— A. I didn't get out. Q. And leaned over. A. I didn't lean."

It could not have escaped the jury that Sherman was so unconcerned about the safety of men in the immediate vicinity of crushing wheels that he did not even lean out of his window to try to determine whether it was safe, in the middle of the night, to back up so dangerous an instrumentality as a tractor-trailer weighing thousands of pounds.

The lower court said further in its opinion: "If the wheels were at a standstill when plaintiff attempted to release the lever and were suddenly and without warning or instructions from the plaintiff or from Sherman started revolving by defendant's employe, which is categorically denied by defendant's witness, then a

question for the determination of the jury arises. But when no such testimony is offered and plaintiff relies wholly upon circumstances and inferences arising from the fact that an accident happened, then the plaintiff has not met the burden of proof required, especially when such testimony was certainly available if true."

This is not reading the record in the light most favorable to the plaintiff, it is, rather, reading the record under a magnifying glass which favors the defendant. To say that there was no testimony that the wheels were stationary just before the accident occurred is to ignore the picture of the accident as related by the plaintiff and his witness. The only ones who could drive the tractor were Brown, Crone, and Sherman. All three of them were outside the tractor and on the ground when Brown began to work on the locking device of the fifth wheel. Was it necessary for Brown to say that the wheels were stationary when there was no one at the controls of the tractor? There are certain inevitable, inescapable factual sequences which do not need specific words to spell them out. When a person talks about having worked under an automobile and specifies that no one was at the steering gear or the gas pedal, he does not need to add that the wheels were stationary. When a person says he was running he does not need to explain that he was lifting his feet from the ground. When the plaintiff said, as he did, that "the next thing he knew" something had hit him "and the wheels were turning" did he need to say that suddenly the wheels were turning?

The plaintiff does not rely, as the court says, "wholly upon circumstances and inferences arising from the fact that an accident happened." He relies upon the law of cause and effect which is as immutable as an algebraic equation. When mechanical wheels can only be set in motion manually by a human operator, who

is at a certain moment far beyond arm's reach of the starting control, it cannot be disputed that the wheels are not in motion at that time.

The court below cited the case of *Titusville Transit Co. v. Johnson,* 375 Pa. 493, but failed to follow its plainly worded precepts, namely, "We said in McDonald v. Ferrebee, 366 Pa. 543, 545, 79 A. 2d 232: 'We shall examine the testimony, as we must on a motion for judgment n.o.v., "in the light most advantageous to the [party who has the verdict]. He must be given the benefit of every fact and every reasonable inference of fact arising therefrom and any conflict in the evidence must be resolved in his favor. . ."' " But in the case at bar, the Trial Court was apparently loath to resolve conflicts in evidence in favor of the plaintiff, and it was reluctant to give to the plaintiff the reasonable inferences arising from the evidence. A judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberation. When the jury returned its verdict for the plaintiff here, it obviously rejected the defendant's driver's statement that he did not move the tractor except on the orders of Brown or Crone. And, once rejected, the statement lost all vitality and could not be used by the court to give life to a theory repudiated by the verdict.*

A jury's verdict is like a building, which is erected from a vast supply of materials, only part of which can satisfy the blueprint of the architect. What is rejected, therefore, has no place in the building, and it can not be forced into the completed structure. In referring to a pretrial statement attributed to Crone the court below said: "Mr. Crone's sworn statement,

---

* *Rossheim v. Bornot, Inc.,* 310 Pa. 154, 156.

Defendant's Exhibit No. 5, given after the accident, which the jury apparently disregarded entirely, corroborates in more detail his testimony in cross-examination." But how can something which has been rejected corroborate anything? How can it be forced into a completed structure which in its harmonious whole completely answers the blueprint of the law on the subject?

The defendant contends further that the plaintiff was guilty of contributory negligence as a matter of law. Since practically every item of evidence on which the defendant bases his charge of contributory negligence was disputed by the plaintiff, the dispute could not be resolved except by the jury, which decided the question in the plaintiff's favor.

The defendant argues also that at the time of the accident, Sherman was not engaged in the course and scope of his employment but was under the control of Brown. Whether or not Sherman was a loaned employee to International Harvester Garage was a question of fact submitted to the jury for its deliberation and on this the lower court has properly said: "We feel, however, that this was a jury question which was adequately and fairly submitted to and determined by the jury by its verdict."

In view of the fact that the court below entered judgment n.o.v., it did not pass on the defendant's motion for a new trial which advanced the following reasons: (1) Verdict against weight of evidence; (2) Court erred in refusing to strike out certain medical testimony; (3) Excessiveness of verdict; (4) Court's refusal to admit pre-trial statement made by defendant's employee, Sherman.

We have considered all these reasons in thoroughly reviewing the entire transcript of the record, and find

that none of them would justify the awarding of a new trial.

The judgment entered by the Court below is reversed and is here entered for the plaintiff on the verdict.