742 A.2d 1052

**Michael S. HUTCHISON, Jr., by Mary J. HUTCHISON, Parent and Natural Guardian, Appellants**

**v.**

**Father Francis LUDDY, St. Therese's Catholic Church, Bishop James Hogan and Diocese of Altoona–Johnstown, Appellees.**

Supreme Court of Pennsylvania.

Argued March 9, 1998.

Decided Nov. 24, 1999.

Reargument Denied Jan. 24, 2000.

Thomas L. Cooper, Pittsburgh, Richard M. Serbin, Altoona, for Michael & Mary Hutchision.

John A. Bednarz, Jr., Wilkes Barre, James F. Mundy, Philadelphia, for Amicus-Pa. TLA.

Carl A. Eck, Louis C. Long, Pittsburgh, for St.Therese's/Bishop Hogan/Dioces.

David J. Weaver, Johnstown, for Father Francis Luddy.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

NEWMAN, Justice.

Michael S. Hutchison, Jr. (Michael) appeals from an Order of the Superior Court that reversed an Order of the Court of Common Pleas of Blair County (trial court) entering judgment in favor of Michael and against Father Francis Luddy (Luddy) and St. Therese's Catholic Church (St.Therese's), Bishop James Hogan (Bishop Hogan), and the Diocese of Altoona–Johnstown (Diocese). We affirm in part, vacate in part, and remand for further proceedings consistent with this Opinion.

### FACTUAL AND PROCEDURAL HISTORY

Michael, who is mildly retarded and has a low I.Q., first met Luddy in 1976, when Luddy became his priest and religious teacher. Approximately one year later, when Michael was ten to eleven years old, Luddy began sexually molesting him. Luddy often took Michael and his brothers out to eat after religion classes, and allowed the boys to watch television in his bedroom at St. Therese's Rectory. He became Michael's godfather, and would ask Michael's mother to take the boys out to dinner. Luddy also traveled with Michael and his brothers, and would often buy the boys toys and candy. During this period, from 1976 to 1982, Luddy molested Mi-

chael approximately fifty to seventy-five times in Luddy's rectory bedroom. By the time Michael was fifteen years old, he became accustomed to turning to Luddy for advice and counsel on personal and religious matters, as well as for "nice things," such as trips and eating out, which were usually intertwined with sexual molestation.

Two other incidents of molestation occurred in 1982 and 1984, when Michael was fifteen and seventeen years old, respectively. At the time of both incidents, Michael was living with his family in Akron, Ohio, and ran away from home to talk to Luddy about problems he was experiencing at home, and Luddy was working at St. Mary's Church in Windber, Pennsylvania, where he had been reassigned in 1980. Michael testified that he specifically requested that they not engage in any sexual activity. Nevertheless, on both occasions, Michael stayed in a motel room in Altoona at the suggestion of Luddy,[1] and Luddy visited Michael, talked with him, and molested him. Only these last two incidents form the basis of this civil action, because the earlier incidents are all barred by the statute of limitations.

In 1988, Michael filed a Complaint against Luddy, St. Therese's, Bishop Hogan and the Diocese, alleging causes of action for, *inter alia*, battery, intentional infliction of emotional distress, and negligent retention and supervision. At trial, Michael testified about the 1982 and 1984 incidents, and introduced the testimony of other boys whom Luddy had abused, including Michael's brother Mark Hutchison (Mark). These witnesses testified that Luddy had abused them, using the same pattern of befriending them, treating them to gifts and trips, and molesting them. One boy testified about two trips to Puerto Rico, during which Luddy repeatedly molested him.

On cross-examination, Luddy admitted that he had molested numerous children, including molesting Mark hundreds of

---

1. Throughout its opinion, the dissent incorrectly asserts that Michael voluntarily invited Luddy to the motel room, when in fact Michael testified that in both 1982 and 1984, it was Luddy who told Michael to rent a room at the Townhouse Motel and that he would meet Michael there as soon as he could. *See* R.R. at 978–987.

times throughout a period of more than four years. He testified that he molested the first child in 1967, approximately two years after his ordination, and that he continued to molest child after child within the Diocese in the years that followed, usually in the rectories where he lived and worked as an assistant pastor. He was supervised by a Diocesan pastor. Luddy admitted that he took many trips with boys from the parish, during which he would molest them.

Michael also presented evidence that the Diocese had actual notice of Luddy's pedophilia since 1967 to 1969, when Luddy was assigned to St. Mark's Church. At that time, a fourteen or fifteen year old boy reported two incidents of molestation to Father Louis Mulvehill, Luddy's supervising priest at St. Mark's. Michael's mother and Mark testified that, in 1981, they reported Luddy's sexual abuse of Mark to two priests in the Diocese. Furthermore, Monsignor Roy Kline, who was Luddy's supervising priest at St. Therese's, testified that he often saw Luddy take Michael, Mark, and other boys into his rectory bedroom, and that he should have known that Luddy was engaged in pedophilic behavior.

After hearing eleven weeks of testimony, the jury returned its verdict on April 21, 1994. The jury specifically found that St. Therese's, Bishop Hogan and the Diocese knew Luddy was molesting children, that they were negligent in their retention and supervision of Luddy, that they had a pattern and practice of ignoring allegations of pedophilic behavior among priests, and that their negligence was a substantial factor in bringing harm to Michael. The jury attributed liability thirty-six percent to Luddy, eleven percent to St. Therese's, and fifty-three percent to Bishop Hogan and the Diocese and awarded Michael a total of $519,000.00 in compensatory damages. The jury also found that the conduct of all the defendants was outrageous, and therefore awarded Michael punitive damages totaling $1,050,000.00 (fifty thousand dollars against Luddy and one million dollars against St. Therese's, Bishop Hogan and the Diocese).

St. Therese's, Bishop Hogan and the Diocese filed Post-trial Motions, which the trial court denied, and then appealed to the

Superior Court.[2] In a reported Opinion, the Superior Court reversed the jury's verdicts, holding that Michael had failed to establish liability pursuant to Restatement (Second) of Torts § 317 (Restatement Section 317). This section, entitled "Duty of Master to Control Conduct of Servant," provides as follows:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

A majority of the Superior Court panel held that the Altoona motel room, the site of the 1982 and 1984 incidents, did not constitute a premises in the possession of St. Therese's, Bishop Hogan and the Diocese, nor one that Luddy was privileged to enter only as their servant, and they therefore held that Michael could not establish liability pursuant to Restatement Section 317. The majority did not address any other issues. Judge Ford Elliott dissented, concluding that Luddy was privileged to enter the motel room only as a priest, and that Michael had proven that St. Therese's, Bishop Hogan and the Diocese knew of Luddy's pedophilic behavior and knew or should have known of the necessity for controlling such behavior. Accordingly, Judge Ford Elliott would have

2. In their appeal to the Superior Court, St. Therese's, Bishop Hogan and the Diocese did not raise any constitutional issues, e.g., free exercise of religion or establishment of religion. Accordingly, any such issues are waived.

affirmed the jury's verdicts as to liability and compensatory damages. She would have reversed the imposition of punitive damages, however, because she believed that there was insufficient evidence of malicious or wanton behavior.

## DISCUSSION

■ In reversing the trial court's entry of judgment on the jury's verdict, the Superior Court essentially entered a judgment n.o.v. Therefore, in reviewing the Superior Court's decision, we must view the evidence in the light most favorable to Michael as the verdict winner, giving him the benefit of every reasonable inference arising from the evidence and resolving any conflict in the evidence in his favor. *See, e.g., Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003 (1992).

In his Complaint, Michael pleads numerous causes of action against Luddy, St. Therese's, Bishop Hogan and the Diocese. In Count Five of the Complaint, Michael alleges that St. Therese's, Bishop Hogan and the Diocese knew or should have known that Luddy was predisposed to engage in pedophilic behavior, and, therefore, they owed a duty to Michael and other parishioners to ensure that Luddy would not be in a position that would permit him to have contact with children. Michael further alleges that St. Therese's, Bishop Hogan and the Diocese breached their duty by: (a) putting Luddy in a position in which he would have contact with children; (b) allowing Luddy to remain in that position; (c) failing to secure treatment for Luddy; and (d) failing to supervise Luddy adequately so as to prevent him from engaging in pedophilic behavior. In Count Six of the Complaint, Michael alleges that the Diocese had a longstanding practice of ignoring pedophilic behavior by priests, e.g., by intentionally failing to investigate reports of abuse; refraining from taking disciplinary action against priests known to have abused children; allowing such priests to continue to participate, without supervision, in activities involving children; and concealing from parents reports of Luddy's misconduct. Thus, in general terms, Counts Five and Six of the Complaint set forth a cause of action against St. Therese's, Bishop Hogan and the Diocese for negligent retention and supervision of Luddy.

Although the Superior Court did not distinguish between St. Therese's and Bishop Hogan and the Diocese, we find an important distinction between these parties. With respect to St. Therese's, the trial court instructed the jury as follows:

> They [St. Therese's] can be found liable if, but only if, you conclude first that St. Therese's did have actual knowledge, they knew, that Father Luddy was engaged in pedophilic relations with minor males before the '83 and '84 incidents. Second, you would have to conclude they knew, and they knew before these incidents, you'd have to conclude that their failure to warn as a result of their actual knowledge was a substantial factor in bringing harm to Michael Hutchison, Jr.

> In other words, they knew they had a duty to warn. And if you find that they didn't warn and as a result of a failure on their part to warn when they should've because they had actual knowledge that Michael Hutchison—this was a substantial factor in causing him harm, that would be the only theory on which St. Therese's as an individual church could be found liable. And if you look at the verdict slip now, . . . if you look at Question 3, we'll read it now, and you'll see that that's exactly, I hope, what's phrased in these questions.

R.R. at 145–46. The court went on to explain the difference between St. Therese's, on the one hand, and Bishop Hogan and the Diocese, on the other:

> I permitted in this case, having told you that you have to consider these separately, you'll now notice that I have put in the question Bishop Hogan and the Diocese of Altoona–Johnstown together. That is true because the legal theories combine them. You should consider each of them separately within the question. Okay? But, if the answer to either Bishop Hogan or the Diocese is yes, you may write yes just as if it was yes as to both. Okay? But I put them together because it makes the verdict slip shorter and the law permits me to do that.

> Now you may wonder why I treated St. Therese's separately and these two together—why I put them together.

And if you read Question 5 I think you'll understand that. 'Do you find, I'm reading Question 5 now, that Defendants, Bishop Hogan and/or the Diocese of Altoona–Johnstown, were negligent in the retention or supervision of Defendant, Father Francis Luddy, as a priest within the Diocese of Altoona–Johnstown?' Well, if you think about that for a second, at the time of the acts in question, in 1983 and in 1984, St. Therese's no longer had any role in the supervision of Father Luddy or whether he was retained by the Diocese, right? He was gone. He was no longer involved with them. The only duty, therefore, that they may have had after he leaves them is they may have had the one that I outlined to you in Questions 3 and 4.[3] That they may have known, that's up to you, and if they did, they may have had a duty to warn and their failure to do that might result in harm to Michael. But they don't have this ability to supervise him anymore after he leaves their parish which, as you know, is well before these incidents, either of these incidents occur. Fair enough? And maybe that helps you see the distinction between the two cases.

Only Bishop Hogan and the Diocese could have a supervisory responsibility or a real right to consider the issues of Father Luddy's retention after his transfer from St. Therese's. So while St. Therese's is part of the Diocese of Altoona–Johnstown certainly, as you know, and their knowledge, if any, may be considered in that respect as part of the Diocese's knowledge, they bear no possible individual responsibility, okay, as an individual church beyond that which I've outlined to you in Question 3 and Question 4.

R.R. at 148–50.

■ The distinction between the causes of action asserted against the various defendants is significant because of the

---

**3.** Question 3 on the verdict form read, "Do you find that Defendant, Saint Therese's Catholic Church, knew that Defendant, Father Francis Luddy, was engaged in pedophilic relations with minor males?" Question 4 read, "Do you find that any failure by Defendant, St. Therese's Catholic Church, to warn based on their actual knowledge was a substantial factor in bringing about harm to Plaintiff, Michael S. Hutchison, Jr.?"

timing of the incidents of abuse on which this action is based. The jury found, and we have no doubt, that St. Therese's failure to warn was a substantial factor in bringing harm to Michael. Unfortunately, we are constrained to find the only harm for which St. Therese's is responsible is the abuse that took place while Luddy was assigned to St. Therese's and Michael was a parishioner there, and liability for all such incidents of abuse is barred by the statute of limitations. Thus, we have no choice but to affirm the Order of the Superior Court insofar as it absolves St. Therese's of liability.

The claim of negligent supervision and retention asserted against Bishop Hogan and the Diocese, however, survived the statute of limitations because Luddy was still a servant of the Diocese at the time of the last two incidents of abuse. We find that the Superior Court erred in its analysis of this cause of action.

In *Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418 (1968), a security guard employed by the defendant assaulted an employee at a bus terminal where the security guard was assigned to work. This Court considered the question of whether the defendant/employer could be held liable because "by reason of [the security guard's] conduct on various occasions prior to [the incident at the bus terminal], [the defendant/employer] knew, or by the exercise of reasonable care, should have known of [the security guard's] dangerous propensity for violence and should not have continued him in its employ...." *Dempsey*, 431 Pa. at 564, 246 A.2d at 419. Applying Restatement Section 317, the Court held that the employer could be held liable if the plaintiff could prove "that the employer knew, or in the exercise of ordinary care, should have known of the necessity for exercising control of [the security guard]," but the Court concluded that "there [was] no evidence of record to show either knowledge or reason for knowledge on the part of [the employer] of [the security guard's] conduct." *Id.*, at 570–72, 246 A.2d at 422–23.

The Superior Court applied the rule of *Dempsey* in *Coath v. Jones*, 277 Pa.Super. 479, 419 A.2d 1249 (1980), with a different result. In *Coath*, a former employee of the defendant

raped the plaintiff, having gained entry to her home by representing that he was there on the defendant's business. The plaintiff alleged that the defendant knew of the perpetrator's propensity for violence against women, and that the defendant was negligent in hiring and retaining the perpetrator and in failing to warn its customers not to allow the perpetrator into their homes.

The trial court sustained the defendant's preliminary objections in the nature of a demurrer, but the Superior Court reversed that decision, holding as follows:

> [A]n employer may be negligent if he knew or should have known that his employee had a propensity for violence and such employment might create a situation where the violence would harm a third person. *Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418 (1968) indicates that an employer may be negligent for the failure to exercise reasonable care in determining an employee's propensity for violence. [Citations omitted].

*Coath*, 277 Pa.Super. at 482, 419 A.2d at 1250. Thus, the Superior Court held that, "the defendant could be found negligent if [the perpetrator] was known to have the inclination to assault women or if the defendant should have known that." *Id.*, at 483, 419 A.2d at 1250. The court further held that, "if it were foreseeable by the defendant that [the perpetrator] ... could attack a customer because he had, on a previous occasion, been admitted to her home on the employer's business, then there would exist a special relationship between defendant and the customer and a duty on the employer to give a reasonable warning to the customer." *Id.*, at 485, 419 A.2d at 1252. The Superior Court concluded that, "the [trial] court improperly sustained the defendant's preliminary objection. Under the status of the pleadings the plaintiff has alleged facts which could support defendant's liability." *Id.* at 486, 419 A.2d at 1252.

Courts in other states have reached the same conclusion in analogous cases. For example, in *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287 (Tex.1996), the plaintiff, who was sexually molested by a scoutmaster, brought an action

against, *inter alia*, the Golden Spread Council of the Boy Scouts of America (GSC), alleging that GSC had negligently recommended and supervised the scoutmaster. In concluding that the plaintiff stated a valid cause of action against GSC, the Supreme Court of Texas held as follows:

> The injury to [the plaintiff] was foreseeable to GSC.... [T]he summary judgment evidence shows that GSC knew of complaints that Estes [the scoutmaster] was "messing with" some boy scouts and was concerned that they might be serious.... [W]e hold that GSC owed a duty in this case. GSC clearly owed a duty to the church that asked GSC to introduce it to a potential scoutmaster. We hold that this duty also extends to the children and parents involved in [the boy scout troop] who relied on GSC and those involved in selecting the [scoutmaster] to provide a scoutmaster who was fit to serve.... GSC's duty is best expressed in comment e to Section 302 B of the Restatement (Second) of Torts, which recognizes that there may be liability "[w]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct." Cases from other jurisdictions support this conclusion. [Citations omitted]. Accordingly, we hold that if GSC knew or should have known that [the scoutmaster] was likely to molest boys, it had a duty not to recommend him as a scoutmaster.

*Golden Spread Council*, 926 S.W.2d at 290–92.

Similarly, in *Marquay v. Eno*, 139 N.H. 708, 662 A.2d 272 (1995), the Supreme Court of New Hampshire held that a school district that knew its employees were abusing children could be held liable for negligent hiring and retention:

> Liability exists not because of when the injury occurs, but because "the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct." [Citation omitted]. Thus, employers have been held liable for criminal conduct by off-duty employees or former

employees where such conduct was consistent with a propensity of which the employer knew or should have known, and the association between the plaintiff and the employee was occasioned by the employee's job. [Citations omitted].

Applying these legal principles to the present case, we find that a school district or school administrative unit (school) has a duty not to hire or retain employees that it knows or should know have a propensity for sexually abusing students. Where the plaintiff can establish that the school knew or reasonably should have known of such a propensity, the school will generally be liable for the foreseeable sexual abuse of students by that employee. Liability based on negligent hiring or retention is not limited to abuse that occurs during the school day. A school may be liable for abuse of a student by a school employee outside of school hours where there is a causal connection between the particular injury and the fact of employment. Also, a school can be held liable for injuries suffered after it knew or should have known of the employee's propensity.

*Marquay*, 662 A.2d at 280–81. *See also L.P. v. Oubre*, 547 So.2d 1320 (La.App.1989) (boy scout council that knew of scoutmaster's conduct could be held liable for scoutmaster's sexual abuse of boy scouts because "[t]he duty of reasonable care, whether characterized as a duty to investigate (discover) to supervise (protect) or to warn, encompasses the risk of harm which plaintiffs encountered."); *Funkhouser v. Wilson*, 89 Wash.App. 644, 950 P.2d 501 (1998) (church that knew of bible teacher's conduct could be held liable for bible teacher's sexual abuse of students, regardless of whether the abuse took place on church premises).

■ The facts and circumstances of the instant case compel the same result as in *Coath* and the other cases cited *supra*. Here, Bishop Hogan and the Diocese knew for certain that Luddy had a propensity for pedophilic behavior and were aware of several specific instances of such conduct. They knew that placing him in a position in which he would have contact with children would afford Luddy ample opportunity to commit further acts of abuse, which would likely result in

extreme harm to the children under his supervision. Knowing all of this, Bishop Hogan and the Diocese had a duty to take appropriate precautions to prevent Luddy from molesting any more children, e.g., by assigning him to a position in which he would not have any contact with children, by ensuring that he sought treatment for his disorder, or by terminating his employment altogether. *See Coath,* 277 Pa.Super. at 485, 419 A.2d at 1252 (quoting Prosser, Torts, § 56 (4 th ed. 19—)) ("It is also recognized that if the defendant's own negligence has been responsible for the plaintiff's situation, a relation has arisen which imposes a duty to make a reasonable effort to give assistance and avoid any further harm.").

Bishop Hogan and the Diocese, however, did not attempt to prevent the foreseeable harm, and instead undertook a course of conduct that increased the risk that Luddy would abuse Michael and other children. Instead of keeping him away from children altogether, they disregarded Luddy's misconduct and allowed him to have unsupervised contact with children. Instead of responding to Luddy's pedophilic behavior, they concealed and ignored it. Bishop Hogan and the Diocese knew Luddy's history and were in a position to prevent him from repeating it, yet for years they willfully allowed him to go on molesting children with impunity. Their inaction in the face of such a menace is not only negligent, it is reckless and abhorrent. Hence, Bishop Hogan and the Diocese are as responsible as Luddy for the harm done to Michael, or, as the jury found, even more liable than the molester himself.[4]

The Superior Court, though, did not consider *Coath* or other case law. Instead, notwithstanding that "the common law in this Commonwealth prior to the promulgation of [Restatement] Section 317 gave recognition to the principles later embodied in Section 317," *Dempsey,* 431 Pa. at 566, 246 A.2d at 420, the Superior Court analyzed Michael's claim for negligent supervision and retention exclusively pursuant to Restatement Section 317. In his brief to this Court, Michael

4. As noted above, the jury attributed liability sixty-four percent to the Diocesan Defendants and thirty-six percent to Luddy.

extensively argues that the Superior Court erred not only in its application of Restatement Section 317, but also that the Superior Court erred in failing to consider his claim for negligent supervision and retention pursuant to other legal authorities, including the caselaw of Pennsylvania and other jurisdictions. *See* Appellant's Brief, at 27–32. The dissent further claims that the " 'case law' of this Court has explicitly adopted Section 317 for determining whether a duty exists in circumstances such as these." Op., at 1065, n.1. This statement is also disingenuous. There has never been a Pennsylvania case with circumstances that closely resemble those of the present case, nor has any Pennsylvania case addressed the privilege element of the location requirement of Restatement Section 317, which is the primary focus of the dissent. Indeed, were Pennsylvania caselaw as well developed and unambiguous as the dissent suggests, it is unlikely this Court would have granted Michael's Petition for Allowance of Appeal.

Moreover, the Superior Court majority erred with respect to the privilege element of the location requirement of Restatement Section 317(a)(i) ("the servant is upon . . . premises . . . upon which the servant is privileged to enter only as [the master's] servant.") In fact, the Superior Court majority did not address the privilege element at all until Judge Ford Elliott discussed it in her dissent. The majority then added the following footnote to its opinion:

> The dissent states that we have not considered the language following the emphasized text of Restatement (Second) Torts § 317(a)(i). . . . Our response is that although Luddy may have been privileged to enter a room at the Townhouse Motel for the purpose of providing pastoral care and guidance to a troubled person seeking such care and guidance, he certainly was not privileged to enter the motel room as a servant of [St. Therese's, Bishop Hogan and the Diocese] for the purpose of engaging in sexual misconduct or other such improper behavior.

*Hutchison v. Luddy*, 453 Pa.Super. 420, 424 n. 6, 683 A.2d 1254, 1256 n. 6 (1996).

■ This approach is clearly erroneous. What Luddy did or intended to do once he was in the motel room is irrelevant. Obviously, no one is ever privileged to enter a room for the purpose of sexually abusing someone. The issue is not what he intended to do once he entered the room, but how he gained access to the room in the first place, i.e., because of his position as a priest or for some other reason. The majority of the Superior Court never attempted to answer this question.

■ Considering the evidence in the light most favorable to Michael, we hold that the jury properly could have found that Luddy was privileged to enter the motel room only as a priest. Michael testified at trial that, in 1982 and 1984, he sought Luddy's counsel as his priest and spiritual advisor,[5] that he specifically asked Luddy not to engage in sexual activity, and that he never asked Luddy for money:

Q.  Now after you came back you say you called [Luddy] and he was at St. Mary's?

A.  Yes sir.

Q.  Did you have, were you able to get in touch with him?

A.  Yes sir I was.

Q.  And did you talk with him?

A.  Yes sir.

Q.  What did you say to him?

A.  I told him that I was having a lot of problems at home and that I didn't like living in Ohio. I didn't have hardly any friends at all, and I was just having problems with my father at home and I didn't want to live in Ohio.

Q.  Did Father Luddy listen to you as you told him these things over the phone?

---

**5.** The dissent makes much of the fact that Michael sought Luddy's counsel concerning problems of a personal nature rather than a religious or spiritual nature. *See* Op., at 1067. The precise nature of Michael's problems, however, is not relevant to the analysis of Restatement Section 317 because, like Michael, many people turn to priests or other clergy for guidance and counseling with respect to personal issues that they are unable or unwilling to discuss with family, friends, or others.

A. Yes sir he did.

Q. What did Father Luddy say to you?

A. He told me to go over to the Townhouse Motel and rent a room and that he would be there as soon as possible.

Q. Alright now let me ask you, did the subject of sex come up in this phone conversation?

A. Yes sir it did.

Q. Can you tell us how it came up or what was said?

A. I had Father Luddy promise me that he wouldn't do nothing to me sexual wise, but he didn't promise me. He just went on to something else.

Q. Why did you bring this conversation up asking him to promise not to do anything with you?

A. Because I didn't want to have sex with him again sir. I just wanted to talk to him.

Q. Why did you want to talk with Father Luddy?

A. Because Father Luddy at that time still meant a whole lot to me. I still cared and loved Father Luddy a lot.

Q. Did you still look upon Father Luddy as your priest?

A. Yes sir I did.

Q. Did you still look upon him as your godfather?

A. Yes sir I did.

. . .

A. Father Luddy gave me two hundred dollars sir before he left.

Q. Did you ask him for two hundred dollars?

A. No sir I didn't ask him for no money at all.

Q. Was there any discussion before he gave you the money about, that you wanted something?

A. No sir there was no discussion at all about that.

Q. Did he say why he was giving you the money?

A. To help me out sir.

Q. Did you go there to see Father Luddy because you wanted money?

A. No sir I didn't.

. . .

Q. Alright, how much did you pay for the room?

A. I believe it was thirty-eight dollars sir.

Q. Alright so now you're just about busted?

A. Yes sir.

Q. Now at this point you spent your money, pretty much all of it, on food and this motel room correct?

A. Yes sir.

Q. And at this point in time you had absolutely no idea did you that Father Luddy for out of the goodness and love in his heart was going to give you two hundred dollars?

A. No sir I didn't.

Q. Because you certainly didn't ask him for it did you?

A. No sir I did not.

Q. He purely volunteered it.

A. He always used to do nice things for me sir.

Q. Alright, but you had no idea that he was going to give you any money that day did you?

A. No sir I didn't.

Q. And you had no intentions of asking him I take it?

A. No sir I did not.

R.R. at 978–1034.   Michael further testified that at all times he considered Luddy to be his priest and godfather and always addressed him as "Father Luddy." *Id.*   The jury also heard Bishop Hogan's testimony, in which he stated, "I don't care where you are.   If you're a priest, you're a priest twenty-four hours a day, every day of the year. . . ."   Bishop Hogan Deposition, 9/28/88, at 139.

Based on this evidence, the jury reasonably could have found that Luddy was privileged to enter the motel room only as Michael's priest, i.e., only as a servant of the Diocese. Even the dissent admits that, "[i]t may well be true that, were it not originally for Luddy's priestly status, he would never have met young Michael Hutchison, and the repeated incidents of sexual abuse which Hutchison endured would never have come to pass."   Op., at 1068.   Thus, the jury reasonably

could have concluded that it was Luddy's status as a priest, both when Michael was young and in 1982 and 1984, that created and perpetuated the relationship that afforded Luddy access to the motel room. Consequently, we conclude that, as to Bishop Hogan and the Diocese, the Superior Court erred in holding that the privilege element of Restatement Section 317(a)(i) was not satisfied. Furthermore, as noted *supra*, Bishop Hogan and the Diocese clearly had the ability to control Luddy, e.g., by forcing him into treatment or terminating his employment, and they had specific knowledge of Luddy's pedophilic behavior, and therefore they knew of the necessity for exercising control of Luddy. Thus, the requirements of Restatement Section 317(b)(i) and (ii) were also met, so the Superior Court should not have vacated the jury's verdicts against Bishop Hogan and the Diocese based on Restatement Section 317.

### CONCLUSION

We conclude that St. Therese's cannot be held liable, and therefore we affirm the Order of the Superior Court insofar as it enters judgment in favor of St. Therese's. We find, however, that the jury's verdicts against Bishop Hogan and the Diocese are legally sustainable. Therefore, we vacate the Order of the Superior Court insofar as it enters judgment in favor of Bishop Hogan and the Diocese, and we remand this case to the Superior Court for consideration of issues raised but not decided in the defendants' direct appeal.

Justice CAPPY files a concurring opinion.

Justice SAYLOR files a concurring opinion in which Justice ZAPPALA joins.

Justice NIGRO concurs in the result.

Justice CASTILLE files a dissenting opinion.

CAPPY, Justice, concurring.

I concur in the result reached by the majority. I write separately to elaborate as to why I believe that vacating the

order of the Superior Court, in part, is appropriate and to disassociate myself from that part of the majority opinion that criticizes the Superior Court for focusing on Restatement (Second) of Torts § 317 as the sole basis for recovery.

The Superior Court entered, in essence, a judgment n.o.v. in favor of Bishop James Hogan, the Diocese of Altoona–Johnstown, and St. Therese's Catholic Church. Critical to the resolution of this case is our court's standard of review.

A judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. *Atkins v. Urban Redevelopment Authority of Pittsburgh*, 489 Pa. 344, 414 A.2d 100, 103 (1980). We must view the evidence in the light most favorable to Michael Hutchison as verdict winner, giving him the benefit of every reasonable inference of fact arising therefrom. Any conflict in the evidence must be resolved in his favor. *Broxie v. Household Finance Company*, 472 Pa. 373, 372 A.2d 741, 745 (1977). It is important to note that a reviewing judge's, or justice's, "appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations." *Brown v. Shirks Motor Express*, 393 Pa. 367, 143 A.2d 374, 379 (1958); *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1007 (1992). It is the application of these legal tenets that, in this case, requires vacation rather than affirmance of the Superior Court's order.

Section 317 of the Restatement (Second) of Torts imposes upon a master a duty to control his servant while acting outside of the scope of the servant's employment in order to protect others from harm. To establish liability under section 317, a plaintiff must establish, *inter alia*, that the servant "is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant." Restatement (Second) of Torts § 317(a)(i).

The case *sub judice* was tried before a jury. The jury was specifically charged only with the elements of section 317 with respect to Bishop Hogan and the Diocese's potential liability.

The jury rendered a verdict against all Appellees. As we presume that the jury has followed the instructions, *Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663, 672 (1992), the jury's finding of liability on the part of Bishop Hogan and the Diocese necessarily was based on a determination that Father Luddy was privileged to enter the motel room *solely* due to his priestly status. The narrow issue before us is whether Michael Hutchison proved liability on the part of Bishop Hogan and the Diocese [1] by establishing that Father Luddy was privileged to enter the premises of the motel room only because of his priestly status.

Review of the record discloses why this issue is so difficult to resolve. Hutchison testified as to what seemed to be a number of reasons why he sought to meet with Father Luddy in the motel room in 1982 and 1984.[2] Thus, rather than one, straightforward reason for Father Luddy's entry into the motel room for our review, we are confronted with numerous, and arguably inconsistent, reasons for Father Luddy's presence.

Yet, simply because a number of reasons, or even inconsistent reasons, were offered by Hutchison as to why Father Luddy was privileged to enter the motel room does not necessarily preclude a finding of liability. This is because the jury, as the finder of fact, is permitted to believe all, part, or none of the evidence. Even parts of the testimony from a

1. I agree with the majority that St. Therese's Catholic Church cannot be held liable. Father Luddy was reassigned from St. Therese's Church to St. Mary's Church in 1980, two years prior to the incidents at issue in this case. Thus, Father Luddy was not serving as a priest at St. Therese's Church at the time of the incidents in question and had not done so for at least two years. Moreover, decisions regarding placement, discipline, and transfer of priests were not made at the parish level. Under these circumstances I do not believe that St. Therese's Church can be held liable.

2. As noted by the majority and the dissent, Hutchison testified on direct and on cross-examination that the reasons he sought to meet with Father Luddy in 1982 and 1984 were: (1) he missed Father Luddy; (2) Father Luddy could help him with his depression; (3) Father Luddy was a good listener; (4) Father Luddy was a kind, nice person; (5) he had love in his heart for Father Luddy; and (5) he believed that Father Luddy might assist him financially. Additionally, Hutchison testified that he still looked upon Father Luddy as his priest.

single witness may be embraced or discarded by the jury. *Martin v. Evans*, 551 Pa. 496, 711 A.2d 458, 463 (1998); *Commonwealth v. London*, 461 Pa. 566, 337 A.2d 549, 552 (1975); *Juchniewicz v. Hawthorne*, 158 Pa.Super. 146, 44 A.2d 301, 303 (1945). Thus, even to the extent the testimony can be viewed as contradictory, the jury was free to accept certain aspects of Hutchison's testimony and reject others. Since the jury could have accepted, and relied upon, those parts of Hutchison's testimony which established that Hutchison sought Father Luddy for counseling for personal problems and at all times viewed Father Luddy as his priest, the jury could have found a causal link between Father Luddy's status as a priest and his entry into the motel room. Therefore, based upon our limited standard of review, I believe that we are compelled to uphold the jury's finding of liability against Bishop Hogan and the Diocese.

The dissent takes a different tack to reach its conclusion. Specifically, the dissent finds that none of the reasons offered by Hutchison satisfies the requirements of section 317. In doing so, the dissent takes a very narrow view of what constitutes priestly duties; in essence, the dissent confines priestly duties to the performance of church ritual. Dissenting Opinion, page 1066. I believe that this interpretation is too circumscribed. Rather, I believe that counseling one on personal problems is part of the varied duties of a clergyperson. While the dissent is correct that those who do not don the robes of a priest might counsel individuals on personal matters, the fact remains that Father Luddy was a priest, whose duties included personal counseling, at the time Hutchison sought his presence. Just because other professions might perform similar services does not make these services any less a part of a priest's duties. Thus, I believe that the dissent's position, while supportable, is one that I cannot join.

While I cannot join the dissent as to the ultimate disposition of this appeal, I do join the dissent with respect to its discussion of the propriety of the Superior Court's exclusive focus on section 317. Dissenting Opinion, page 1066, footnote 2. Specifically, I expressly disassociate myself from that part

of the majority opinion which faults the Superior Court for failing to review theories of liability on which the jury was not charged. The jury was instructed on liability solely pursuant to section 317. Other similar or potential causes of action were not presented to the jury. While an appellate court may affirm the decision of the court below on an alternative basis, *E.J. McAleer & Co., Inc. v. Iceland Products, Inc.*, 475 Pa. 610, 381 A.2d 441, 443, n. 4 (1977), I do not believe that it is jurisprudentially sound for a reviewing court to inject new theories of recovery into the proceedings at the appellate stage, especially when those theories were never brought to the attention of the jury.

For the above-stated reasons, I concur in the result reached by the majority.

SAYLOR, Justice, concurring.

I join in the result achieved by the majority insofar as it absolves the parish and affirms the jury's finding of liability against the Bishop and the Diocese under Restatement (Second) of Torts § 317.

Since the matter is to be remanded to the Superior Court for consideration of all other issues raised by Appellant, specifically including the plaintiffs' entitlement to punitive damages, I am unable, at this procedural juncture, to join in the majority's characterizations of the defendants' conduct as reckless and abhorrent inasmuch as it will be for the Superior Court, in the first instance, to assess the award of punitive damages based on the facts presented to the jury.

Justice ZAPPALA joins this concurring opinion.

CASTILLE, Justice, dissenting.

I respectfully dissent. As a reviewing court, our task is simply to ascertain the governing law and to apply it without passion or prejudice. This task grows more difficult in a case such as this one, where the facts engender a great deal of outrage against the tortfeasor and sympathy for the victim. Nevertheless, I believe that the governing law is fixed and

clear, and that it precludes liability for either Bishop Hogan, St. Therese's Catholic Church, or the Diocese of Altoona–Jamestown. Consequently, I am constrained to dissent.

The threshold determination that must be made in any tort case is whether a duty of care is owed by the defendant to the plaintiff. If a duty of care is owed, then a determination must be made as to what level of care was required to discharge the duty, whether there was a breach of the duty, whether the breach caused damages, and what the damages were. *Martin v. Evans*, 551 Pa. 496, 502, 711 A.2d 458, 461 (1998). This Court has adopted Section 317 of the Restatement of Torts in determining whether an employer owes a duty to a third party to control the conduct of a servant when that servant is acting outside the scope of his employment. *See Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 568, 246 A.2d 418, 420 (1968)(collecting appellate cases since this Court adopted Section 317).[1] Section 317 provides as follows:

## § 317. DUTY OF MASTER TO CONTROL CONDUCT OF SERVANT

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

1. The Opinion Announcing the Judgment of the Court suggests that the Superior Court erred on the issue of whether a duty existed by limiting its analysis to Section 317, implying that "case law" should have been considered separate and apart from Section 317. I cannot glean wherein the putative error lies, since the "case law" of this Court has explicitly adopted Section 317 for determining whether a duty exists in circumstances such as these. *Dempsey, supra.* Moreover, the jury was charged *only* under Section 317 of the Restatement with respect to appellees' potential liability. R.R. at 151a–159a. However, the Opinion Announcing the Judgment of the Court here believes that it is appropriate to support a verdict with reference to a theory of liability upon which the jury was never even charged. For all these reasons, the Superior Court properly confined its analysis to Section 317 of the Restatement. Thus, this Dissenting Opinion focuses exclusively on why Section 317 precludes liability.

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

Thus, while the Opinion Announcing the Judgment of the Court may well be correct that appellees acted negligently in retaining or in failing to discipline Luddy, or in neglecting to keep him away from children altogether, this determination in and of itself is not legally significant unless a determination is first made that appellees owed a duty to appellant under Section 317 at the time of the incidents at issue. Since the servant in this case, Luddy, was not upon premises in possession of the master at the time of the alleged negligent acts, the essence of the inquiry becomes whether Luddy was upon premises which he was privileged to enter *only* as his master's servant. Rest. (Second) Torts § 317(a)(ii). The evidence adduced at trial, even when viewed in the light most favorable to appellants as verdict winners, did not support a finding by the jury that Luddy was privileged to enter Michael Hutchison's hotel room *only* due to his status as a servant—in this case his status as a priest of the Diocese of Altoona–Johnstown. Stated succinctly, Luddy's status as a priest of the Diocese was irrelevant to Hutchison's decision to ask Luddy to meet him and to allow Luddy access to the hotel room.

It is important first to note that, in both the 1982 and 1984 encounters, Hutchison's calls to Luddy requesting a meeting were unsolicited. Thus, Luddy did not gain access to Hutchison's hotel room by explicitly invoking his status as a priest; instead, he gained access because Hutchison called and asked for the meetings.[2] Hutchison did not testify that he sought a

---

2. In footnote one, the Opinion Announcing the Judgment of the Court quarrels with the way we characterize the manner in which Hutchison

meeting with Luddy in order for Luddy to perform any sort of religious function or simply because Luddy was a priest. To the contrary, when Hutchison departed for Altoona to arrange the 1982 and 1984 meetings with Luddy, he did not even know if Luddy was still a priest in the Diocese of Altoona–Johnstown. R.R. at 1028, 1040.[3] Thus, it defies reason to suggest that Luddy's standing as a priest in the Diocese of Altoona–Johnstown provided the sole impetus for Hutchison's visits when Hutchison himself testified that he was not even sure of Luddy's priestly status at the time he arranged the visits with Luddy.

While Hutchison did not provide any testimony which would support an inference that Luddy was allowed access to the hotel room solely by virtue of his status as a priest in the Diocese of Altoona–Johnstown, Hutchison did provide testimony which established a number of other motivating factors behind his decision to seek out Luddy. While the existence of any one of these factors would be sufficient to preclude liability under Section 317(a)(ii), the combination of factors present in this case renders application of the governing law a most simple task.

First, regarding the 1982 encounter, Hutchison testified that he ran away from his home in Akron in order to return to Altoona because his father was beating him, because he did

allowed Luddy to have access to his hotel room. Apparently it is a matter of judicial notice for the Opinion Announcing the Judgment of the Court that, at the moment that Hutchison allowed Luddy to enter into the room he had rented, Hutchison's will was overborne and he was incapable of "voluntarily" allowing Luddy into his room. In any event, it is undeniable that it was Hutchison who first initiated contact with Luddy with respect to the 1982 and 1984 incidents, and that it was Hutchison who rented a room and permitted Luddy to enter into that room on each occasion.

3. Q: Matter of fact I take it that you undertook this hitch hiking trek to Altoona from Ohio not even knowing if Father Luddy was still assigned to St. Mary's Parish ... didn't you?
   A: I figured he was still there sir.
   Q: But you didn't know?
   A: As far as being positive no sir I didn't.
   Q: You just took a chance he would be there?
   A: Yes sir.
   R.R. at 1028a.

not have many friends in Ohio, and because he missed his friends in Pennsylvania. With regard to his specific motives for inviting Luddy to visit him in his hotel room upon his return to Altoona, Hutchison testified as follows:

Q: Alright (sic). You just wanted to call and see him because you were feeling depressed and he was the person you wanted to talk to?

A: I missed Father Luddy allot·(sic) sir.

Q: And did you feel he could help you with your depression?

A: Yes I did feel he could.

. . . .

Q: I want to find out what part money played in your decision once you got back to Altoona wanting to see your friends, what part money played in your decision to call Father Luddy?

A: Sir I knew Father Luddy would help me out 'cause he had done a lot of nice things for me throughout the years and I knew he would help me out.

. . . .

Q: You said Father, what did you say to Father?

A. I told him that I was having a lot of problems at home, and that I didn't like living in Ohio, and I wanted to see him.

Q: And I think you told the ladies and gentlemen of the jury you told Father Luddy that you were depressed and you wanted to talk to him because he was a good listener right?

A: Yes sir.

Q: He was a kind person apparently according to you? A nice person?

A: Yes sir.

R.R. at 1039a; 1166–67.

Regarding the 1984 encounter, Hutchison provided the following testimony regarding his motives for meeting with Luddy:

Q: Why did you decide that you wanted to see Father Luddy this time?

A: Because I had really missed him again and I still had deep love in my heart for him sir.

Q. When you came in the fall of 1984 when you said more or less to see Father Luddy because you needed money did you expect that he would give you two hundred dollars more for another sex act?

A. I didn't know how much he would give me. I knew he would help me out with some money sir.

Q. You knew he would give you some money for a sex act right?

A. Not for a sex act but I kind of figured he'd, I got used to him having sex with me and when I get around him he never could keep his hands off me so I figured he would have sex with me that time.

Q: And would give you money?

A: I figured he would help me out sir yes.

R.R. at 1200a–1204a.

In sum, Hutchison testified that he arranged the 1982 and 1984 meetings with Luddy because he missed Luddy, he was depressed, he wanted someone to talk to, he knew Luddy was a kind person and a good listener who could help with his depression, he had a deep love in his heart for Luddy, and he thought Luddy might give him some money.[4] Clearly, Hutchison had a number of personal problems—none of a spiritual or religious nature—and he thought that Luddy might be able to offer him assistance, financial or otherwise, in dealing with

---

**4.** The Opinion Announcing the Judgment of the Court points to conflicting testimony, adduced on direct examination, on the role that money played in Hutchison's decision to invite Luddy into the hotel room. The point, however, is that myriad factors entered into Hutchison's mind—apart from the fact that Luddy was a priest in the Diocese of Altoona–Johnstown—when he made his decision to call Luddy and arrange a meeting. Even if he had been ousted from the Priesthood in 1982 or 1984, Luddy still would have possessed all the qualities that led Hutchison to seek his assistance at these times. This is precisely why Hutchison stated that he called Luddy and sought him out even though he had no idea of Luddy's priestly status at these times. The Opinion Announcing the Judgment of the Court simply ignores this fact.

these problems. While being able to help with depression or being a good listener may be qualities that many priests possess, they certainly are not inextricably intertwined with the notion of Priesthood. A priest does not stop becoming a priest if he is unable to help people who are depressed; conversely, being able to help people who are depressed does not make one a priest. Similarly, the fact that Hutchison loved and missed Luddy is not inherently related to Luddy's status as a priest. Thus, by his own admission, Hutchison allowed Luddy into the room for reasons apart from his status as a priest in the Diocese of Altoona–Johnstown.

In light of Hutchison's own testimony, the notion that he might have refrained or hesitated from inviting Luddy into the room if Luddy had announced immediately prior to entry that he was no longer a priest in the Diocese of Altoona–Johnstown flies in the face of both the record and common sense.[5] Yet this is what would be required in order to impose liability on the Diocese under Section 317. Consequently, the Diocese owed no duty to appellant under Section 317. In the absence of such a duty, appellant cannot recover against the Diocese for negligence.

It may well be true that, were it not originally for Luddy's priestly status, he would never have met young Michael Hutchison, and the repeated incidents of sexual abuse which Hutchison endured would never have come to pass.[6] Howev-

---

**5.** The Opinion Announcing the Judgment of the Court attaches significance to the fact that Bishop Hogan testified that "if you're a Priest, you're a Priest 24 hours a day, every day of the year." It may be true that priests are priests at all times, but the relevant question under the Restatement is why Hutchison chose to allow Luddy into his hotel room. Luddy's standing as a priest, as the excerpted testimony illustrates, was irrelevant to Hutchison's decision to allow him into his room.

**6.** The Opinion Announcing the Judgment of the Court takes this negative causal inference out of its context and attempts to convert it into a positive causal inference that Luddy's priestly status *did* provide the exclusive impetus which drove Hutchison to invite him into his hotel room. As a matter of logic, the Opinion Announcing the Judgment of the Court's approach here is unsound. The fact that Luddy might never have had the opportunity to meet Hutchison if Luddy was not a priest does not in any way entail that it was only Luddy's priestly status, and

er, the very narrow issue in this appeal is whether Luddy's priestly status, and his priestly status *alone*, allowed him to secure access to Hutchison's hotel room on the two occasions in 1982 and 1984. Hutchison's own testimony categorically negates any conceivable notion of an exclusive causal nexus between Luddy's priestly status and his entry to the hotel room. Instead, Hutchison's testimony plainly establishes that he allowed Luddy into his hotel room for a number of reasons, all of which were unrelated to Luddy's standing as a priest in the Diocese of Altoona–Johnstown.

In sum, appellant's own testimony establishes that appellees did not owe him a duty under Section 317 of the Restatement. Because appellees owed no such duty with respect to the two incidents at issue, appellant's cause of action in negligence may not be sustained. Accordingly, I am constrained to dissent.[7]

not other factors, which caused Hutchison to allow him access to his hotel room on the occasions in question.

**7.** I note that the Opinion Announcing the Judgment of the Court in this matter should not be viewed as conferring this Court's imprimatur on a cause of action against a religious sect under Section 317 for Constitutional purposes. A number of other state supreme courts have declined to authorize a cause of action against a religious sect for negligent retention of its religious leaders because to do so would result in excessive entanglements with religious beliefs contrary to the First Amendment of the United States Constitution. *See Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis.2d 302, 533 N.W.2d 780 (1995); *Gibson v. Brewer*, 952 S.W.2d 239 (Mo.1997); *Swanson v. Roman Catholic Bishop of Portland*, 692 A.2d 441 (Me.1997). Without commenting on the merit of these decisions, I note simply that the issue of excessive entanglement was not before this Court in this matter, and, accordingly, should not be viewed as having been laid to rest by this decision.